IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| LUCRESIA MAYORGA SANTAMARIA, | § | |
| on behalf of DOE Children 1-3; and | § | |
| ORGANIZACION PARA EL FUTURO | § | |
| DE LOS ESTUDIANTES (OFE), | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:06-CV-692-L |
| | § | |
| DALLAS INDEPENDENT SCHOOL | § | |
| DISTRICT; DALLAS INDEPENDENT | § | |
| SCHOOL DISTRICT BOARD OF | § | |
| TRUSTEES; MICHAEL HINOJOSA, | § | |
| SUPERINTENDENT OF THE DALLAS | § | |
| INDEPENDENT SCHOOL DISTRICT, | § | |
| in his official capacity; and | § | |
| TERESA PARKER, in her individual and | § | |
| official capacity as Principal of Preston | § | |
| Hollow Elementary School, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

This lawsuit concerns allegations of unlawful segregation of Latino school children at

Preston Hollow Elementary School ("Preston Hollow"), an elementary school in a predominantly

Anglo neighborhood in Dallas, Texas.[1]  Plaintiffs are Lucresia Mayorga Santamaria ("Ms.

Santamaria") on behalf of her three Latino children (Doe Children #1, #2 and #3) and Organizacion

Para El Futuro de los Estudiantes ("OFE"), a not-for-profit organization of parents on behalf of their

Latino children who attend Preston Hollow (collectively, "Plaintiffs").  Plaintiffs bring this suit

---

[1]The court primarily uses the terms "Anglo," "African-American," and "Latino" to reference the ethnic groups discussed at trial, although the words "white," "black," and "Hispanic" are also used to reflect actual trial testimony. Although Plaintiffs are not seeking relief on behalf of African-American students at Preston Hollow, evidence regarding Preston Hollow's African-American students was presented at trial with regard to the ethnic makeup of certain classes.

against Defendants Dallas Independent School District ("DISD" or "District"), DISD Board of Trustees ("Board of Trustees"), Dr. Michael Hinojosa in his official capacity as Superintendent of DISD ("Superintendent Hinojosa"), and Teresa Parker, in her official capacity as Principal of Preston Hollow and in her individual capacity ("Principal Parker") (collectively, "Defendants").

Plaintiffs allege that Latino schoolchildren attending Preston Hollow are intentionally segregated by Defendants on the basis of race, color, or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution[2] and Title VI of the Civil Rights Act of 1964.[3]  Plaintiffs contend that because Defendants segregate Latino children from Anglo children, Latino children at Preston Hollow are being denied the opportunity to learn in integrated classrooms, which contributes to a sense of inferiority.  Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages.

On April 18, 2006, Plaintiffs filed their complaint and sought an *ex parte* temporary restraining order, which the court denied.  On April 26, 2006, Plaintiffs sought preliminary injunctive relief, asking the court, *inter alia*, to enjoin Defendants from unlawfully segregating Latino schoolchildren at Preston Hollow, and to require Defendants to institute appropriate policies,

---

[2]The Fourteenth Amendment to the United States Constitution provides in pertinent part:
> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

[3]Title VI of the Civil Rights Act of 1964 provides in relevant part:
> No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d (2003).  It appears that Plaintiffs use the terms "race, color, or national origin" to track the language of Title VI.  In light of the court's determination that Defendants are not liable under Title VI, *see infra*, the court uses the terms "race or national origin" instead.

**Memorandum Opinion and Order - Page 2**

practices, training and other measures to remedy the alleged unlawful segregation.  On June 12, 2006, pursuant to Fed. R. Civ. P. 65(a)(2), the court advanced and consolidated the trial of this action on the merits with the hearing on Plaintiffs' Motion for Preliminary Injunction.

The court held a bench trial on Plaintiffs' claims beginning August 9, 2006 and ending on August 21, 2006.[4]  The following fact witnesses testified on behalf of Plaintiffs: Ms. Janet Leon (Fourth Grade Preston Hollow teacher), Ms. Terri Schill (Second and Third Grade Preston Hollow teacher), Ms. Sally Walsh (First Grade Preston Hollow teacher), Mr. Robert McElroy (Preston Hollow Assistant Principal), Ms. Santamaria, Ms. Ana Gonzalez (President of OFE and Latina parent of Latino Preston Hollow students), Ms. Veronica Perez (computer records clerk at Preston Hollow), Ms. Frances Martinez Guzman (proffered expert witness who had observed classes at Preston Hollow and interviewed teachers), and Dr. Richard R. Valencia (proffered expert witness on within-school discrimination).  Defendants' witnesses included Superintendent Hinojosa, Dr. Gilda Alvarez-Evans (DISD's Assistant Superintendent for the Multi-Language Enrichment Program), Ms. Alice "Meg" Davis Bittner (Preston Hollow PTA President), Principal Parker, Ms. Ana Cranshaw (a Latina parent with children at Preston Hollow), and Mr. Joe Campos (Area Representative for the League of United Latin American Citizens).  By this Memorandum Opinion and Order, the court makes its findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).[5]

---

[4]Numerous objections were made during the course of trial regarding evidence.  To the extent the court's ruling on any particular objection is not apparent from the record, if the court used the evidence to which an objection was lodged, the court has **overruled** the objection.  If the court did not use the evidence to which an objection was lodged, the court determined that the evidence to which objection was made was not necessary for its decision in the case, and therefore such objection was **overruled as moot**.

[5]As directed by the court, Plaintiffs and Defendants filed their respective Proposed Findings of Fact and Conclusions of Law on September 1, 2006.  With regard to the court's findings of fact and conclusions of law, any finding of fact more properly characterized as a conclusion of law is hereby deemed a conclusion of law, and any

Based on the court's findings and conclusions, as set out below in detail, the court **determines** that Defendants DISD, the Board of Trustees, Superintendent Hinojosa in his official capacity, and Principal Parker in her official capacity have no liability to Plaintiffs under the Fourteenth Amendment to the United States Constitution or Title VI of the Civil Rights Act of 1964. The court **determines** that Defendant Principal Parker in her individual capacity has violated the Fourteenth Amendment and is therefore liable to Doe Children #1 and #3 for nominal and punitive damages, and that Plaintiffs Doe # 3 and OFE are entitled to injunctive relief. The court **determines** that Defendant Principal Parker in her individual capacity has no liability to Plaintiffs under Title VI.

## I.    Issues Presented and Contentions of the Parties

### A.    Plaintiffs' Contentions

Plaintiffs contend that Defendants, primarily by way of classroom assignments, segregate and discriminate against Plaintiff Latino children attending Preston Hollow on the basis of race, color, or national origin, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Title VI of the Civil Rights Act of 1964. Specifically, Plaintiffs contend that Defendants channel and segregate certain Latino students into English as a Second Language ("ESL") classes, even though the school has already determined that these particular Latino students are English-proficient, and therefore not in need of Bilingual or ESL instruction under state law. In the vernacular of academic testing and classification, the Latino students at issue in Plaintiffs' complaint are "non-Limited English Proficient," or "non-LEP." Limited English Proficient ("LEP") students, by contrast, are in need of Bilingual or ESL classes

---

conclusion of law more properly characterized as a finding of fact is hereby deemed a finding of fact.

based on the results of state-mandated testing.[6]  Plaintiffs also contend that Defendants deliberately channel Anglo students with the same language needs as non-LEP Latinos to "General Education classes," also known as "neighborhood classes," which are disproportionately Anglo as contrasted with the overall percentage of Anglos in the student population.  Plaintiffs further contend that Defendants' classroom assignments are an unlawful attempt to stop "white flight" from Preston Hollow, a predominantly minority school in a predominantly Anglo neighborhood.  Plaintiffs contend that providing ESL instruction to non-LEP students does not provide non-LEP Latino students with the same educational opportunities as their non-LEP Anglo peers, and that segregating the non-LEP Latinos from Anglos causes them feelings of inferiority and stigmatization.

More generally, Plaintiffs contend that, for certain grade levels, the predominantly minority classes are located along separate hallways from the predominantly Anglo classes.  Plaintiffs also argue that the predominantly minority ESL classes (and Bilingual classes) do not integrate with the predominantly Anglo General Education classes for core curriculum and very rarely, if at all, for non-core curriculum, in violation of federal law and state law which requires that LEP students "participate with their English-speaking peers in regular classes provided in the subjects" and "have a meaningful opportunity to participate with other students in all extracurricular activities."  *See* Tex. Admin. Code § 89.1210(g).

In their First Amended Complaint, Plaintiffs request the court to declare that Defendants have violated their rights to equal protection under the Fourteenth Amendment to the United States Constitution and under Title VI of the Civil Rights Act of 1964, and request it to enjoin Defendants from further violating their rights to equal educational opportunities under the Fourteenth

---

[6]The court uses the term "Limited English Proficient" or "LEP" interchangeably with "English Language Learner" or "ELL," and "non-LEP" with "non-ELL."

Amendment and Title VI.  Plaintiffs also request that the court issue an order requiring Defendants to immediately evaluate the educational opportunities afforded non-LEP students in the ESL and General Education classes and remedy any deficiencies, and that the court issue an order requiring Defendants to immediately integrate non-core curriculum instruction, such as art, music, computer, and physical education.

### B.    Defendants' Contentions

Defendants contend that they did not intentionally discriminate against any student at Preston Hollow and that no student was subjected, under color of state law, to the deprivation of any rights, privileges or immunities secured by the Constitution and laws of the United States of America. Defendants also contend that they are in full compliance with state and federal law, in identifying and serving LEP students, and that state law mandates they offer Bilingual education.  Defendants' broader contention is that non-LEP minority students in ESL classes are receiving an equal educational opportunity as non-LEP Anglo students in General Education classes, since all classes at Preston Hollow follow DISD's mandated curriculum, and the same scope and sequence.[7] Defendants additionally contend that teachers in ESL classes do not actually instruct in Spanish, and a non-LEP student in an ESL-designated class is, in essence, receiving general instruction in English from an ESL-certified teacher, the same as an Anglo student in a General Education class. Defendants further contend that because ESL-designated classes contain LEP and non-LEP students, LEP students are in fact "participat[ing] with their English-speaking peers in regular classes provided in the subjects[,]" as required under state law.

---

[7]Dr. Gilda Alvarez-Evans (DISD's Assistant Superintendent for the Multi-Language Enrichment Program) defined "scope and sequence" as "a continuum of expectations for the students" based on "certain essential knowledge and skills that are defined by grade level" by the State of Texas.  Tr. Vol. V-A, at 45.

As to Doe #1, Defendants admit that even though Doe #1 exited LEP status in September 2005, during the entire 2005-2006 academic year Doe #1 remained in an ESL-designated classroom. Defendants contend that continued assignment to the ESL-designated class is not harmful to Doe #1, since Doe #1 does not receive instruction in Spanish and receives general instruction in English from an ESL-certified teacher.   Defendants contend that Doe #2 and Doe # 3 are properly placed based on testing results.   Defendants finally contend that OFE does not have standing to bring this case under 42 U.S.C. § 1983 for alleged violations of the Fourteenth Amendment because OFE "was not deprived of any rights, privileges, or immunities secured by the Constitution and laws of the United States of America," Def. Proposed Conclusion of Law No. 432, and that OFE lacks standing to bring a Title VI claim against them.   Def. Proposed Conclusion of Law No. 428.

II.    **Findings of Fact**[8]

A.    **The District**

DISD is a school district located in Dallas County, Texas, and established pursuant to the Constitution of the State of Texas and the Texas Education Code.  DISD is responsible for the operation of all public schools within its boundaries, including Preston Hollow.  District-wide, the enrollment for DISD for the 2005-2006 academic year was approximately 6% Anglo, 63% Latino and 30% African-American and 1% other.[9]  Superintendent Hinojosa is the General Superintendent of DISD and has held this position since the summer of 2004.  The Board of Trustees, composed of nine (9) elected members, is the governing body of DISD and is responsible for the policies and practices of DISD.  The Board of Trustees oversees Superintendent Hinojosa.

Superintendent Hinojosa is ultimately responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of DISD employees.  Superintendent Hinojosa has several deputy superintendents, including Dr. Steve Flores, Deputy Superintendent for the School Support Services Division, and Dr. Denise Collier, Deputy Superintendent for the Instructional Services Division.  DISD has approximately 240 campuses, which are divided into six (6) areas, each with an Area Superintendent who ultimately reports to Dr. Flores, who then reports to Superintendent Hinojosa.  The Area 4 Superintendent from approximately January 2006 though

---

[8]The facts contained herein are either undisputed based upon the evidence admitted, or facts found by the court after considering the credibility or believability of each witness.  In making such credibility determinations, the court considered all of the circumstances under which the witness testified, which include: the relationship of the witness to Plaintiffs or Defendants; the interest, if any, the witness has in the outcome of the case; the witness's appearance, demeanor, and manner of testifying while on the witness stand; the witness's apparent candor and fairness, or the lack thereof; the reasonableness or unreasonableness of the witness's testimony; the opportunity of the witness to observe or acquire knowledge concerning the facts to which he or she testified; the extent to which the witness was contradicted or supported by other credible evidence; and whether such contradiction related to an important factor in the case or some minor or unimportant detail.

[9]Unless otherwise specified, the court's findings relate to the 2005-2006 academic year.

April 2006 was Vicki Mitchell.   Reporting to Dr. Collier is Dr. Gilda Alvarez-Evans, Multi-Language Enrichment Assistant Superintendent.   DISD also employs a Student and Parent Engagement Executive Director, Rene Martinez.

DISD receives federal money to maintain and operate educational programs for its schools. Pretrial Order ¶ 8.  DISD was under a federal desegregation order from the early 1980s until June 23, 2003, when the Honorable Barefoot Sanders, Senior United States District Judge, released the District from court supervision.  *See Tasby v. Moses*, 265 F.Supp.2d 757 (N.D. Tex. 2003).

Under state law, absent a statutory exception, a school in DISD "may not enroll more than 22 students in a kindergarten, first, second, third, or fourth grade class."  *See* Tex. Educ. Code Ann. § 25.112(a) (Vernon 2006).  With respect to student/teacher ratios for these grades, absent an exception under § 25.112, each school must employ a sufficient number of certified teachers "to maintain an average ratio of not less than one teacher for each 20 students in average daily attendance."  *Id.* § 25.111.

### 1.    Classification of Limited English Proficiency ("LEP") Students Upon Initial Enrollment in DISD

Upon initial enrollment in DISD, every student's parent or guardian is given a "Home Language Survey" ("HLS") to be signed and dated.   The HLS identifies the student's home language.[10]  Where a parent or guardian indicates a language spoken at home other than English, the student is categorized as a potential-LEP student pending testing.  The potential-LEP student is then administered the Woodcock Muñoz Language Survey ("Woodcock Muñoz"), a Texas Education

---

[10]The HLS contains the following questions: "(1) What language is spoken in your home most of the time?" and "(2) What language does your child (do you) speak most of the time?"  *See* Def. Ex. 31 at 92.

**Memorandum Opinion and Order - Page 9**

Agency-approved diagnostic assessment used by DISD to measure a student's English proficiency.[11]

The possible range of scores on the Woodcock Muñoz is 1 through 6.  In  Kindergarten and First

Grade, a student with a score of 1, 2 or 3 on the Woodcock Muñoz  is classified as "LEP."  A student

with a 4 or up on the Woodcock Muñoz is classified as non-LEP.  In Second Grade through Sixth

Grade, in addition to the Woodcock Muñoz scores described above, a student must score at or above

the 40th percentile on the "Standard 9 (Abbreviated Form)" in order to be classified as non-LEP.[12]

DISD offers a Bilingual Education program and an English as a Second Language ("ESL")

program to its LEP students at Preston Hollow.  DISD is required to offer a Bilingual education

program to LEP students in grades pre-Kindergarten through Fifth Grade (and Sixth Grade if

clustered with elementary grades) if the District enrolls twenty (20) or more LEP students in any

language classification in the same grade level.  DISD's Multi-Language Enrichment Program PK-5

Guide ("MLEP Guide") provides:

> Bilingual education and English as a second language (ESL) shall be
> taught to enable [LEP] students to become competent in the
> comprehension, speaking, reading and composition of the English
> Language.  Programs shall emphasize mastery of English language
> skills as well as mathematics, science, and social studies, as integral
> parts of the academic goals for all students to enable LEP students to
> participate equitably in school.  Bilingual education and ESL
> programs shall be integral parts of the total school program.  These
> programs shall use instructional approaches designed to meet the
> special needs of LEP students[,] and the basic curriculum content of
> the program shall be based on the [required] state essential
> knowledge and skills.

---

[11]Where the HLS indicates that Spanish is the primary language spoken in the home, the potential-LEP student is given the Spanish Woodcock Muñoz Language Survey.  From the evidence provided by the parties, the court has no reason to believe that the court should treat the Spanish Woodcock Muñoz differently than the English Woodcock Muñoz.

[12]The "Standard 9 (Abbreviated Form)" is a Texas Education Agency-approved "language proficiency and norm referenced instrument[] used to identify LEP students for whom a language other than English is indicated on the [HLS] in grades 2-12."  Def. Ex. 31 at 130.

Def. Ex. 30 at 17-18.[13]   The State of Texas requires that LEP students "participate with their English-speaking peers in regular classes provided in the subjects" and "have a meaningful opportunity to participate with other students in all extracurricular activities."  Tex. Admin. Code § 89.1210(g).  Because DISD is understaffed with bilingual certified instructors,  ESL instruction is provided to some students who might otherwise qualify for bilingual education.  DISD is committed to its LEP program.

If a school district is required to provide Bilingual education and ESL programs, it must establish and operate one or more campus language proficiency assessment committees ("LPACs").  The campus administrator has the responsibility of establishing the campus LPAC.  The LPAC identifies LEP students through the HLS, the Woodcock Muñoz and, in the case of students in Second Grade and older, the Standard 9 (Abbreviated Form), and makes the final placement decision into an ESL or Bilingual program.  Students identified as LEP through the Woodcock Muñoz must be placed in the appropriate program within four (4) weeks of initial enrollment in the District.

### 2.       Exiting LEP Status

The MLEP Guide also states that "Identified English language learners will follow the initial instructional program placement until recommended by the LPAC for program exit/reclassification using criteria established and monitored by the state."  Def. Ex. 30 at 18.  When identified LEP students have been recommended for exit/reclassification by the campus LPAC, the students' academic achievement is monitored by the campus LPAC for a period of two years.  Def. Ex. 31 at 169.  By state law, students are not to be considered for exit/reclassification until the end of Second

---

[13]The primary difference between the Bilingual education classes and ESL classes is that the former are taught in the student's primary language and English, whereas the latter are taught in English with a focus on second-language acquisition methods.

**Memorandum Opinion and Order - Page 11**

Grade.  The LPAC Handbook provides that when a student meets the exit criteria to become non-LEP, "the identified student is to be recommended for enrollment into the general education classroom with no second language acquisition modifications."  *Id.* at 164.

### B.    Preston Hollow Elementary School

Preston Hollow is an elementary school in DISD which served grades pre-Kindergarten through Sixth during the academic year 2005-2006.  Preston Hollow is located in Area 4 of DISD.  In the current academic year, Preston Hollow serves grades pre-Kindergarten through Fifth.  Preston Hollow is located at 6423 Walnut Hill Lane in Dallas, Texas.[14]  While the neighborhood is primarily Anglo, the student body at Preston Hollow is predominantly Latino.  Preston Hollow's enrollment in the 2005-2006 academic year was approximately 18% Anglo, 66% Latino, 14% African-American, and 2% Asian.

Principal Parker has served as Preston Hollow's principal since the fall of 2001, when the DISD Superintendent at the time, Dr. Mike Moses, hand-selected her for the job.  He identified two objectives for her position: (1) to increase student academic performance, as Preston Hollow had been ranked as a "low-achieving school" in the 1998-1999 school year; and (2) to help build greater representation of all parents in the community than was currently present at Preston Hollow.

By DISD requirement, Preston Hollow has a LPAC.  Preston Hollow also has a Campus Instructional Leadership Team ("CILT") which has the primary role of "evaluat[ing] instructional

---

[14]As best the court can discern from the evidence and testimony presented, Preston Hollow's  attendance zone for the 2005-2006 academic year was bounded on the west by Preston Road and generally extended east past U.S. Highway 75 (Central Expressway).  The northernmost portion of the attendance zone extended to Royal Lane west of Hillcrest Road, and to Meadow Lane east of Hillcrest Road.  The southernmost portion extended south to Northwest Highway (Loop 12), at times dropping south of Northwest Highway in the easternmost portion of the attendance zone.  The attendance zone for academic year 2006-2007 is almost identical, except for the addition of an area east of Central Expressway that is north of Park Lane.  *See* http://www.dallasisd.org/eval/schoolinfo/prestonhollow, of which the court takes judicial notice pursuant to Fed. R. Evid. 201.

**Memorandum Opinion and Order - Page 12**

strategies that are used throughout the year, particularly those strategies that are documented in a campus improvement plan[.]" Tr. Vol. II, at 213.  All classes at Preston Hollow follow DISD's mandated scope and sequence.

Some Latino parents at Preston Hollow formed a unincorporated non-profit organization in the 2005-2006 school year commonly known as "Padres Hispanos de Preston Hollow" or "El Grupo de Padres Hispanos."  This group later changed its name to "Organizacion Para El Futuro de los Estudiantes ("OFE")."  Ms. Ana Gonzalez ("Ms. Gonzalez") is the President of OFE.  The mission of OFE is to stop segregation and obtain equal educational opportunities for Latino children.  OFE was organized by former members of the "Preston Hollow Hispanic Parents," which was formerly the Hispanic Advisory Committees at Preston Hollow.  Ms. Gonzalez and Ms. Santamaria are members of OFE and testified that OFE had approximately fifty (50) members.[15]

---

[15]Ms. Ana Cranshaw, a witness who testified at length on behalf of Defendants, told the court that she had never heard of OFE.  She also testified that she disagreed with Ms. Gonzalez's and Ms. Santamaria's complaints that Preston Hollow was not supportive of Hispanic parents.  Instead, Ms. Cranshaw believed that Ms. Gonzalez and Ms. Santamaria, along with teacher Graciela McKay, sought the removal of Principal Parker because she was Anglo and did not speak Spanish.  Having carefully considered the testimony and observed the demeanor of the witnesses, the court accepts the testimony of Ms. Gonzalez and Ms. Santamaria regarding OFE and its membership and goals.  Both provided similar testimony, and the court has no reason to disbelieve them.  That Ms. Cranshaw had not heard of OFE or did not participate in the concerns of its members is quite beside the point and is not enough for the court to doubt the credibility of Ms. Gonzalez and Ms. Santamaria.  Moreover, the minutes of the February 3, 2006 PTA Board Meeting reveal that Ms. Cranshaw was selected as the Latina representative of the Preston Hollow PTA to attend the PTA convention.  *See* Pl. Ex. 198 ("Ginger Pitts made the recommendation that the PTA sponsor Ana Cranshaw and Laura Flores as the Hispanic PTA members to attend the PTA Convention Feb. 10-12, 2006.  The Board voted in agreement.").  It was clear to the court that Ms. Cranshaw did not share Ms. Santamaria's and Ms. Gonzalez's sentiments or their approach with respect to Principal Parker.  Moreover, the court in observing Ms. Cranshaw realizes that she did not fully appreciate the magnitude of the problem regarding the issues raised in Plaintiffs' First Amended Complaint.  Her testimony and evidence that the PTA selected her as its Latina Representative indicate that Principal Parker and Ms. Meg Bittner were more receptive to her than to Ms. Gonzalez and Ms. Santamaria, which accounts for Ms. Cranshaw's testimony being more supportive of Principal Parker and Ms. Bittner than Ms. Gonzalez and Ms. Santamaria.  In short, from the PTA Board minutes and other evidence in the record, the court finds that Ms. Cranshaw is biased in favor of Defendants, and therefore does not place as much weight in her testimony.

**Memorandum Opinion and Order - Page 13**

### 1.      Classroom Assignments at Preston Hollow

Principal Parker has the ultimate authority to determine a student's classroom assignment at Preston Hollow.  A student's classroom "assignment" is different than a student's "placement," the former being the assignment of a student to a particular classroom and teacher, the latter being a student's placement in the ESL or Bilingual program based on whether the student is "LEP" or "non-LEP."   The Board of Trustees has delegated to Principal Parker the responsibility of "grouping" students at Preston Hollow, including "grouping" of students within the building in order to provide the "best instructional arrangement," and within a class or class session in order to "ensure effective management of instruction" and to "facilitate instruction." Pl. Ex. 283.  At the end of each academic year, Principal Parker receives a list of students who will be attending Preston Hollow the following academic year from Preston Hollow's campus records clerk, which is generated by Pupil Accounting located at DISD's central office.  Also at the end of each school year, teachers routinely provide the front office with "student placement cards," which contain recommendations for classroom and teacher assignments for the next grade level.

During the 2005-2006 academic year, Preston Hollow students could be assigned to one of three types of classes: a "Bilingual" class, an "ESL-designated" class, or a "General Education" class (also known as a "neighborhood class").  Other than Ms.  Bias, who taught 4A-ESL in the 2005-2006 academic year, all Preston Hollow teachers were ESL-certified. *See* Pl. Ex. 147.  In First through Fourth Grade, the General Education classes had students of mixed-ages; in Kindergarten, Fifth and Sixth Grade, they did not.  Excepting Bilingual classes which where comprised of 100

percent Latino students,[16] during the 2005-2006 academic year, the following is a list of possible classes to which a student could be assigned for each grade at Preston Hollow, along with the teacher and the room number:

Kindergarten:          KA-ESL (Wood) Room 1
                       KB-ESL (Chance) Room 2
                       KC-Gen. (Prudhomme) Room A-3

First Grade:           1A-ESL (Walsh) Room 16
                       MA1-Gen. (Wells) Room 44

Second Grade:          2A-ESL (Lauffer) Room 40
                       2B-ESL (Weigler) Room 41
                       MA1-Gen. (Wells) Room 44
                       MA2-Gen. (Veal) Room 43
                       MA3-Gen. (Schill) Room 42

Third Grade:           3A-ESL (Chambers) Room 19
                       3B-ESL (Glick) Room 30
                       MA4-Gen. (Humphress) Room 36
                       MA5-Gen. (Grimm) Room 37

Fourth Grade:          4A-ESL (Leon) Room 32
                       4B-ESL (Bias) Room 29
                       MA4-Gen. (Humphress) Room 36
                       MA5-Gen. (Grimm) Room 37

Fifth Grade:           5A-ESL (Pickens) Room P11
                       5B-ESL (Curtis) Room P14
                       5C-Gen. (Brand) Room P16

Sixth Grade:           6A-ESL (Binfield) Room P12
                       6B-ESL (Brumbelow) Room P13
                       6C-Gen. (Mitchell) Room P10

---

[16]Bilingual classes were taught in the student's primary language and English, and were comprised of 100 percent Latino students. *Plaintiffs' allegations are not directed to the assignment of LEP Latino students to Bilingual classes, but only to the disproportionate assignment of non-LEP Latino students, as compared to non-LEP Anglo students, to ESL-designated classes. Plaintiffs' only complaint pertaining to the Bilingual classes at Preston Hollow appears to be that Defendants do not integrate Latino students in the Bilingual classes with the Anglo students in the general education classes for non-core curricular activities. Pl. First Am. Compl. ¶ 55.* The court accordingly limits its analysis of the Bilingual classes at Preston Hollow to this particular issue.

**Memorandum Opinion and Order - Page 15**

In December 2005, in response to complaints by Latino parents that classrooms at Preston Hollow were segregated based on race and national origin, Principal Parker prepared a chart (Pl. Ex. 117) to demonstrate that at Preston Hollow "there were no classes that house 100 percent Anglo students." Tr. Vol. VII-A, at 100.  In relevant part, the chart prepared by Principal Parker shows the following ethnic breakdown by class, as well as the percentage of LEP students and total number of students for that class:[17]

|          | %Latino | %Anglo | %AA   | %Other | %LEP | #Pupils |
|----------|---------|--------|-------|--------|------|---------|
| KA-ESL   | 52.9    | 5.9    | 29.4  | 11.8   | 17.6 | 17      |
| KB-ESL   | 42.9    | 0      | 35.7  | 21.4   | 14.3 | 14      |
| KC-Gen.  | 6.7     | 66.7   | 20    | 6.6    | 0    | 15      |
| 1A-ESL   | 77.7    | 11.1   | 11.1  | 0      | 38   | 18      |
| MA1-Gen. | 10      | 75     | 10    | 5      | 0    | 20      |
| MA2-Gen. | 25      | 43.8   | 25    | 6.3    | 0    | 16      |
| MA3-Gen. | 27.7    | 55.6   | 16.7  | 0      | 0    | 18      |
| 2A-ESL   | 78.9    | 5.2    | 15.8  | 0      | 68.4 | 19      |
| 2B-ESL   | 61.1    | 11.1   | 16.6  | 0      | 38.8 | 18      |
| 3A-ESL   | 76.2    | 4.7    | 19.05 | 0      | 61.9 | 21      |
| 3B-ESL   | 72.2    | 0      | 27.7  | 0      | 44.4 | 18      |
| MA4-Gen. | 27.3    | 63.6   | 4.5   | 4.5    | 0    | 22      |

---

[17]In certain instances, Principal Parker left a blank in the chart in lieu of using a "0." Examples include: the percentage of LEP students in General Education classes (none); the percentage of Anglo students in certain ESL-designated classes, such as KB-ESL, 4A-ELS, 5A-ESL, 5B-ESL, 6A-ESL and 6B-ESL (none); and the percentage of African-American students in certain General Education classes, such as MA5-Gen. (none).  In conforming to the evidence, the court has inserted a "0," where appropriate, in place of a blank.

**Memorandum Opinion and Order - Page 16**

| | | | | | |
|---|---|---|---|---|---|
| MA5-Gen. | 34.8 | 60.9 | 0 | 4.3 | 0 | 23 |
| 4A-ESL | 81.3 | 0 | 6.2 | 12.5 | 31.3 | 16 |
| 4B-ESL | 63.6 | 4.5 | 31.8 | 0 | 9 | 22 |
| 5A-ESL | 84.6 | 0 | 11.5 | 0 | 38.5 | 26 |
| 5B-ESL | 88.5 | 0 | 11.5 | 0 | 34.6 | 26 |
| 5C-Gen. | 17.9 | 64.3 | 3.5 | 14.3 | 0 | 28 |
| 6A-ESL | 72.7 | 0 | 27.3 | 0 | 9 | 22 |
| 6B-ESL | 72.7 | 0 | 18.2 | 9 | 54.5 | 22 |
| 6C-Gen. | 47.4 | 31.58[18] | 21.1 | 0 | 0 | 19 |

---

[18]*Assistant Principal McElroy testified that, prior to the Sixth Grade teachers independently shuffling their students' classroom assignments to make the Sixth Grade classrooms less segregated in the latter part of the school year, all Anglo Sixth Graders were assigned to 6C-Gen.  This testimony is consistent with Plaintiffs' Exhibit 117, which indicates that 6A-ESL and 6B-ESL had no Anglo students.  The evidence shows that 6A-ESL was comprised of 72.7% Latino students and 27.3% African-American students.  Of these minority students, 91% were non-LEP.  No testimony has been provided by Principal Parker or any other witness testifying for Defendants to explain why all non-LEP Anglos were assigned to the General Education class, 6C-Gen., whereas the minority students with identical language needs as the Anglos were disproportionately assigned to ESL classes.*

**Memorandum Opinion and Order - Page 17**

Pl. Ex. 117.[19]  Dr.  Gilda Alvarez-Evans (DISD's Assistant Superintendent for the Multi-Language Enrichment Program) created a chart using data generated in April 2006 (*see* Pl. Ex. 277 at 4) which shows that in many of the ESL-designated classes, there were more non-LEP Latinos than LEP Latinos, whereas the non-LEP Anglos were rarely, if ever, similarly assigned to the ESL-designated classes, even though, as testified to by Dr. Evans, they had the same language learning needs as non-LEP Latinos.

In sum, the evidence and testimony presented at trial, including Plaintiffs' Exhibits 117 and 277, show, unsurprisingly, that Bilingual classes were comprised entirely of Latino children and were 100 percent LEP.  As already stated, Plaintiffs are not complaining about classroom assignments of LEP Latinos to these Bilingual classes.  The court also heard testimony that some LEP Latino students were assigned to ESL-designated classes, as DISD was understaffed with bilingual certified instructors, and received permission from DISD to provide ESL instruction to

---

[19]Although Principal Parker testified that the percentages in Pl. Ex. 117 represented a "snapshot" of the enrollment at Preston Hollow on one day in December 2005 and that Preston Hollow's "high mobility rate" would skew the statistics, having compared the ethnic breakdown in student classroom assignments in Plaintiffs' Exhibit 117 with the ethnic breakdown in Plaintiffs' Exhibit 128 (showing end-of-year enrollment data from May 2006), and the April 2006 data generated by Dr. Gilda Alvarez-Evans (DISD's Assistant Superintendent for the Multi-Language Enrichment Program) (*see* Pl. Ex. 277 at 4), and having heard the testimony of Assistant Principal Robert McElroy and the teachers who testified on behalf of Plaintiffs that Plaintiffs' Exhibit 117 was generally consistent with their observations regarding class makeup throughout the 2005-2006 school year, the court determines that Plaintiffs' Exhibit 117 is an accurate approximation of the ethnic breakdown in student classroom assignments at Preston Hollow throughout the 2005-2006 academic year, even taking into account the "high mobility rate" at Preston Hollow. Assistant Principal McElroy even testified that the "high mobility rate" might change the numbers in Plaintiffs' Exhibit 117 by tenths or maybe even a point. Tr. Vol. II, at 219, 234.  Plaintiffs' Exhibit 128 is a DISD document showing end-of-year enrollment data from May 2006.  Having carefully considered the data in Exhibit 128, the court finds that for the ESL-designated and General Education classes, the distribution of Latino, Anglo and African-American students is similar to that in Plaintiffs' Exhibit 117.  The documents produced by Defendants for end-of-year enrollment did not include data for mixed-age classes. The only significant difference noted by the court between Plaintiffs' Exhibits 117 and 128 is the percentage of Latino students in 6C-Gen. and the percentage of Anglos in 6C-Gen. and 6A-ESL. Specifically, 6C-Gen. had a far greater percentage of Latino students in May 2006 than in December 2005, and a lesser percentage of Anglos.  This change in the ethnic breakdown in Sixth Grade classroom assignments is consistent with Assistant Principal McElroy's testimony that some time during the second semester of the 2005-2006 school year, the Sixth Grade teachers independently shuffled their students to make the classrooms less segregated. Tr. Vol. II-B, at 247.  Moreover, as set forth in more detail below, the data pulled in April 2006 by Dr. Evans in preparing her campus report and chart (Pl. Ex. 277 at 4) approximate the percentages from Plaintiffs' Exhibit 117.

**Memorandum Opinion and Order - Page 18**

LEP students who might otherwise qualify for bilingual education.   Plaintiffs are not complaining about classroom assignments of these LEP Latinos to ESL-designated  classes.

Plaintiffs' First Amended Complaint pertains to classroom assignments of non-LEP students only.  With regard to non-LEP Latino students, the evidence shows non-LEP Latino students and African-American students were assigned in grossly disproportionate numbers to the ESL-designated classes **without regard to their language abilities**, whereas their similarly situated non-LEP Anglo classmates were assigned to the General Education classes.  Otherwise stated, the evidence demonstrates that as to those Latino and African-American students with identical language learning needs as Anglo students (that is, they were all non-LEP), the non-LEP Latinos and African-American students were assigned in a grossly disproportionate manner to ESL-designated classes, while their Anglo peers were assigned, with few exceptions, to "General Education" classes, also known as "neighborhood classes," which were predominantly Anglo.[20]

### 2.    Placement and Classroom Assignments of Plaintiff Children

Plaintiff Ms. Santamaria had three (3) children in attendance at Preston Hollow in 2005-2006,  Doe #1, Doe #2 and Doe #3.  Doe #1's initial HLS indicated Spanish as the language spoken at home.  Doe #1 was subsequently identified as LEP and placed in the ESL program at Preston Hollow.  At the end of the 2003-2004 academic school year, Doe #1 was promoted to Fifth Grade. During the 2004-2005 academic year, Doe #1 was placed in an ESL program in Fifth Grade.  Doe #1 was retained in the Fifth Grade for the 2005-2006 academic year.  The Preston Hollow LPAC exited Doe #1 from LEP-status on September 13, 2005.  Ms. Santamaria received notification of his

---

[20]The only General Education class that was not predominantly Anglo was 6C-Gen.  As Assistant Principal McElroy testified, however, 6C-Gen. contained **all the Anglo Sixth Graders** until later in the academic year when the teachers decided on their own to desegregate the Sixth Grade.

non-LEP status in September 2005.  *See* Pl. Ex. 8.  During the 2005-2006 academic year, Doe #1 was assigned to 5A-ESL.  Doe #2's initial HLS indicated English and Spanish as the languages spoken at home.  Doe #2 was identified as LEP and placed in the ESL program.  In the Fifth Grade, he was assigned to 5A-ESL, the same classroom as Doe #1.  Class 5A-ESL had no Anglo students and was 100% minority.[21]  Ms. Santamaria testified that she had visited Doe #1 and Doe #2's classroom and never observed an Anglo child in that class.  Doe #3's initial HLS indicated Spanish as the language spoken at home.  In First Grade (the 2003-2004 academic year), Doe #3 scored a 4 on the Woodcock Muñoz, which meant she was non-LEP.  *See* Pl. Ex. 277 at 9.  She was placed in a Bilingual program in First and Second Grades and transferred to the ESL program in Third Grade.  *Id.*  She was assigned to 3B-ESL.[22]  Class 3B-ESL was 100% minority.  Ms. Santamaria testified that she had visited Doe #3's classroom and never observed an Anglo child in that class.

Ms. Santamaria testified that her children "feel separated from the other children, Anglos." Tr. Vol. VI-A, at 115.  She further testified that her children told her "that the general [education] classes are the ones that are more advanced [than] where they are [. . .] [and] have commented that they don't feel intelligent like they are."  *Id.*  Her daughter told her she has no Anglo friends and that she feels "bad" compared to the Anglo children.  *Id.* at 116.

---

[21]A class that is 100% minority is one comprised entirely of African-American, Latino and "other" non-Anglo students.

[22]The court notes a discrepancy between the agreed stipulations of fact in the Joint Pretrial Order and the evidence presented at trial.  According to the Joint Pretrial Order, Doe #3 was in 3B-ESL during the 2005-2006 academic year; according to the 2005-2006 student profiles, Doe #3 was in 3A-ESL.  As the parties have agreed that Doe #3 was in 3B-ESL, the court will treat this as correct, although it does not affect the court's analysis.

**Memorandum Opinion and Order - Page 20**

OFE President Ms. Gonzalez enrolled her child about a week before school started in 2005. Her child's HLS indicated English/Spanish, and she scored a "5" on the Woodcock Muñoz. She was also identified as gifted and talented. She was classified as non-LEP. She was assigned to KB-ESL. KB-ESL had no Anglo students. After realizing that her non-LEP daughter had been placed in an ESL-designated classroom and becoming concerned regarding her child's progress, Ms. Gonzalez and others had a meeting in January 2006 with various area representatives. Principal Parker was present, as was area representative Mary Morehead. When asked on direct examination what occurred at the meeting, Ms. Gonzalez testified that when she inquired about her daughter's classroom assignment, Principal Parker told her that "the children were assigned to [LEP] classes according to their origin and from what country they came from." Tr. Vol. I-A, at 116. When asked what she understood from Principal Parker's statement, Ms. Gonzalez testified that "[i]t was very obvious to me that that's how my daughter was placed in LEP, because she didn't qualify for that, but she was placed there because of her origin and the country she had come from." *Id.* Ms. Santamaria testified similarly that at the meeting she was told that ESL "classes were assigned to children that came from other countries." Tr. Vol. VI-A, at 138.

Ms. Gonzalez testified that her daughter was told by an Anglo child that her hair was ugly and that she asked if she could color it blonde. Her daughter told her that she believes the Anglo children in the neighborhood classes are smarter.[23]

---

[23]The court notes that Ms. Gonzalez wept as she testified regarding the adverse impact of the school classroom assignments on her Kindergarten daughter.

C.        **Testimony of the Preston Hollow Teachers**

Three Preston Hollow teachers testified on behalf of Plaintiffs about student classroom assignments during the 2005-2006 academic year and in previous years, namely, Ms. Janet Leon (4A-ESL), Ms. Terri Schill (MA3-Gen.), and Ms. Sally Walsh (1A-ESL).[24]  Not a single teacher from Preston Hollow testified on behalf of Defendants.  The three testifying teachers had extensive teaching experience and had taught both mixed-age classes and ESL classes at Preston Hollow, and were thus competent to testify as to their personal experiences and observations in both.  Without exception, the court finds the testimony of the teachers highly credible and sincere.

1.        **Ms. Leon**

At the time she testified, Ms. Leon had been a teacher at Preston Hollow for twelve (12) years.  Ms. Leon is ESL-certified.  During the 2005-2006 academic year, she taught math and science in 4A-ESL.  Between 2002 and 2005, she was a third grade ESL teacher for math and science.  From 1995-2001, Ms. Leon taught mixed-age classes for Third and Fourth graders, specifically MA5-Gen.  For the 2006-2007 academic year, Ms. Leon is teaching at a different school.

Ms. Leon testified that in the 2005-2006 academic year, excluding Bilingual classes, there were four possible classes to which a Fourth Grader could be assigned: her 4A-ESL class, Ms. Bias's 4B-ESL Class, MA4-Gen. or MA5-Gen.  The MA4-Gen. and MA5-Gen. classes contained both Third and Fourth graders and were also known as "General Education classes" or "neighborhood classes."  "Neighborhood classes" were made up of predominantly Anglo students.  When asked why the neighborhood classes were grouped as they were, Ms. Leon testified that it was

---

[24]The court takes judicial notice under Fed. R. Evid. 201 that Ms. Leon, Ms. Schill and Ms. Walsh are all Anglo.

done "to have all the neighborhood children grouped together," and further testified that "the people who live in the Preston Hollow neighborhood, who are the majority being white, would want their children grouped together."  Tr. Vol. II, at 160.  She also testified that the predominantly Anglo "neighborhood classes" were made up of children who were not bused to Preston Hollow, but who were driven to school and dropped off in the circular carpool lane in front of the school.

Ms. Leon's 4A-ESL class had approximately sixteen (16) students.  Of these sixteen (16), none was Anglo, 81.3% were Latino, 6.2% were African-American and 12.5% were "other."  Although she was uncertain at first regarding the percentage of non-LEP students in her class, after Plaintiffs' attorney refreshed her recollection with certain documents, Ms. Leon testified that more than nine (9) of her sixteen (16) students were non-LEP.[25]   Ms. Leon testified that, having taught both ESL and mixed-age classes at Preston Hollow, although she taught the same District-mandated scope and sequence, the pace of the ESL-designated class was for the most part slower.  She testified also that in her 4A-ESL class, "I would try to slow the activities down so that the children had a better understanding of what I was trying to teach them."  Id. at 166.

Ms. Leon team-taught with Ms. Bias, who taught 4B-ESL, which had approximately twenty-two (22) students.  Ms. Bias was the only teacher at Preston Hollow who was not ESL-certified.  Class 4B-ESL was 63.6% Latino and 31.8% African-American.  See Pl. Ex. 117.  Of these minority students, only nine percent (9 %) were LEP.  Id.  An Anglo Bosnian student in 4B-ESL was moved during the year to a mixed-age class after his parents complained that he was not making sufficient progress in the ESL-designated class.  Other than the Bosnian student, the evidence introduced at

---

[25]These numbers are generally consistent with those set forth in Plaintiffs' Exhibit 117, which shows that 4A-ESL was 31.3% LEP.  See Pl. Exh. 117.  Plaintiff's Exhibit 277, prepared by Dr. Evans in April 2006, similarly shows that of the sixteen (16) students in 4A-ESL, six (6) were LEP.

**Memorandum Opinion and Order - Page 23**

trial shows that 4B-ESL, like 4A–ESL, had no Anglo students during the 2005-2006 academic year. As shown in Plaintiff's Exhibit 277, prepared by Dr. Evans, only two (2) students in 4B-ESL were LEP. The remaining nineteen (19) students were non-LEP minority students, whose language learning needs were no different than non-LEP Anglo students' language learning needs.

In general, the evidence and testimony show that students in the ESL-designated classes did not integrate with students in the General Education classes. *See* Pl. Ex. 112. Classes 4A-ESL and 4B-ESL generally did not integrate with MA4-Gen. or MA5-Gen. for instruction or for specials (which in the spring of 2005 included art, computers, music and physical education). The court's examination of the student rotation schedule confirms this general lack of integration for specials between the ESL-designated classes and Bilingual classes on the one hand, and the mixed-age classes on the other hand. *See* Pl. Ex. 174. According to the testimony at trial, 4A-ESL and 4B-ESL only integrated with the neighborhood classes when a special was canceled because the school could not locate a substitute teacher. The mixed-age predominantly Anglo classes did combine with one another for specials. Ms. Leon testified that during her previous years as a Preston Hollow teacher, the practice of non-integration was similar.

### 2. Ms. Walsh

Ms. Walsh, with twelve (12) years of teaching experience at Preston Hollow (and twenty-three (23) years of total teaching experience), provided similar testimony regarding the ethnic composition of classrooms. Ms. Walsh taught 1A-ESL during the 2005-2006 academic year and was the "inside track representative" for Preston Hollow. In prior years she taught mixed-age classes at Preston Hollow. Like Ms. Leon, she testified that the children in the "neighborhood classes," were children who lived in the actual Preston Hollow neighborhood and were

predominantly Anglo.  Of the approximately eighteen (18) children in her class, approximately fourteen (14) were Latino, two (2) were African-American, and two (2) were white.  The two white children were not from the Preston Hollow neighborhood but were bused to the school.   She testified that her class was approximately 62 % non-LEP.[26]  Ms. Walsh testified that the white neighborhood kids were placed together in neighborhood classes because "the parents want them to be together."  Tr. Vol. IV, at 28-29.

Evidence pertaining to the 1A-ESL class shows six (6) students whose parent or guardian indicated that only English was spoken in the home (that is, they responded  "English/English" to the questions on the HLS).  Based on the responses to the HLS, these student were never considered potential-LEP and were therefore never required to take the Woodcock Muñoz.  They were assigned to 1A-ESL, and not the general education classes.  Of these six (6), all were minority.   The assignment of non-LEP minority students in disproportionate numbers to ESL-designated classes occurred in other grades as well.  Evidence pertaining to KA-ESL show that the parents or guardians of 14 out of 18 students indicated  "English/English" on their HLS, but were assigned to KA-ESL, and not the general education classes.  Class KA-ESL was only 5.9 percent Anglo.

Class 1A-ESL was "self-contained," which means that Ms. Walsh taught every subject to the children in the class.  Otherwise stated, a student assigned to Ms. Walsh's homeroom class was instructed throughout the day in all subject matters by Ms. Walsh.  Ms. Walsh testified that her class did not integrate with the neighborhood classes for core curriculum.  The class schedules produced by DISD confirm her testimony.  *See* Pl. Ex. 112.

---

[26]Ms. Walsh's testimony regarding the high percentage of non-LEP students in 1A-ESL squares with Plaintiffs' Exhibit 117, which shows that in 1A-ESL, 38% of the students were LEP, and with Plaintiffs' Exhibit 227, prepared by Dr. Evans, which shows that of the nineteen (19) students in 1A-ESL, only six (6) were LEP.

Over the years, Ms. Walsh raised her concerns regarding the ethnic composition of classes at Preston Hollow to various area superintendents.  She testified that in response to her concerns, she was told that "it is a difficult problem at our school[.]" Tr. Vol. IV-A, at 24.  When asked if she knew what "it" was that the area superintendents were referring to she testified:

> The parents in the school [,] they liked to have some of the children together because they like to be able to have friends and some of the things that go on[;] they play baseball and soccer and all those things together, and there is a limited number of Anglo children in school. So they want them to have friends and be with people that live in the neighborhood, so that they have friends.

*Id.*

Ms. Walsh also provided testimony that when she was in the office checking her mailbox she overheard Principal Parker guarantee a prospective Anglo parent that her child would be in the same class as another Anglo child, as there were mixed-age classes and neighborhood kindergarten classes.  Ms. Walsh also testified that as early as June 2005, Principal Parker had already determined that the seventeen (17) incoming "neighborhood students" would be placed in Ms. Prudhomme's General Education class (KC-Gen.), and if more neighborhood students enrolled than anticipated at that time, another teacher would be brought in to team-teach with Ms. Prudhomme.  Ms. Walsh stated that she was concerned about this because there were other equally-qualified Kindergarten teachers available, without having to bring in another teacher to team-teach with Ms. Prudhomme.  In addition, the ESL-designated Kindergarten classes contained fewer students than the twenty-two (22) state-mandated maximum.  Plaintiffs' Exhibit 117 shows that KA-ESL had seventeen (17) students and KB-ESL had fourteen (14) students.[27]

---

[27]Similarly, Dr. Evan's chart using data from April 2006 shows eighteen (18) students in KA-ESL and fifteen (15) students in KB-ESL, well below the state-mandated maximum.  Pl. Ex. 277 at 4.

**Memorandum Opinion and Order - Page 26**

### 3.    Ms. Schill

Ms. Schill taught MA3-Gen. in the 2005-2006 academic year.  Prior to that she taught Second Grade ESL for approximately sixteen (16) years.  She testified that her mixed-age class integrated with other mixed-age classes, and would only integrate with ESL-designated classes for physical education if a specials' teacher was absent and a substitute could not be located.  Again, the class schedules produced by DISD confirm her testimony that the predominantly Anglo mixed-age classes did not integrate during the school day with predominantly minority ESL classes or wholly-minority Bilingual classes.  *See* Pl. Ex. 112, 174.

She testified that generally her ESL-designated classes had moved at a slower pace than her mixed-age class and her mixed-age class had more time for enrichment.  She also testified that non-LEP students were better off academically in the mixed-age classes than the ESL-designated classes because of the pace.

### 4.    No "Sound Pedagogical Reason" for Classroom Assignments

Ms. Schill, Ms. Walsh and Ms. Leon all testified that, based on their numerous years of experience as educators, they could think of no "sound pedagogical reason" why non-LEP minority students were taught in separate classes than non-LEP Anglo students, as their learning needs were the same.  They also testified that there was no reason why an ESL-certified teacher could not instruct Anglo non-LEP students in an ESL-designated class.  This testimony was not rebutted.

### D.    Testimony of Assistant Principal McElroy

The court also heard the testimony of Assistant Principal Robert McElroy.  Assistant Principal McElroy has a Bachelor of the Arts in Philosophy and a Master's in Educational Administration.  Assistant Principal McElroy is African-American.  The court found his testimony

highly credible and consistent with the testimony provided by Ms. Leon, Ms. Walsh and Ms. Schill. At the time of trial, Assistant Principal McElroy had been Preston Hollow's Assistant Principal for eight (8) years.  In the 2006-2007 school year, he will be the principal at another school.  Since 2001, Principal Parker was his supervisor.   As Assistant Principal, his primary duties were "discipline management, test coordination, lunchroom supervision, and supervision of support staff or para-professionals and teacher observations."  Tr. Vol. II, at 213.  During his years at Preston Hollow, he was a member of the LPAC and CILT.  He testified that the primary job of CILT was to "evaluate instructional strategies that are used throughout the year, particularly those strategies that are documented in a campus improvement plan or a CIP."  *Id.*  According to Assistant Principal McElroy, CILT was not responsible for student classroom assignments at Preston Hollow, but did have input.  He testified that Principal Parker was always responsible for student classroom assignments.

He testified that most of the teachers had raised concerns to him in the past about the manner in which students were being assigned to classes at Preston Hollow.  He testified that both he and Principal Parker recognized that there was a problem that needed to be fixed because of the predominantly white classes, and that she had made the mixed-age classes more diverse in the 2005-2006 school year than in previous years by increasing minority representation in them.  He also testified that he urged Principal Parker numerous times during the 2005 and 2006 academic year that class groupings needed to be adjusted to avoid the appearance of segregation.  In an e-mail to Principal Parker following a meeting in the spring of 2005, Assistant Principal McElroy articulated his position that "aside from state/district-mandated grouping (i.e. Bilingual Education) we must avoid the appearance of segregation.  In my opinion our current class groupings appear social-based

or race-based. [. . .] I believe we have taken important steps toward promoting diversity. However, shouldn't we now take giant steps to avoid all appearances of segregation or racial/social grouping?" Pl. Ex. 225. He further testified that during prior years he had also raised his concerns regarding "race and ethnicity in the classrooms." Tr. Vol. III-A, at 40.

Assistant Principal McElroy also testified that "most people that have any interaction with the school, teachers, faculty, staff members [. . .] custodians, [and] para-professionals" referred to the mixed-age classes as "neighborhood classes." Tr. Vol. II, at 224. When asked why the term "neighborhood classes" was used, he testified, "Well, quite frankly, because the majority of [. . . ] those students are from the immediate neighborhood[,] not bused in." *Id.* at 224-25. He testified that "most of the white students are in what you would call the neighborhood classes. Most of them look alike by the color of their skin." *Id.* at 225.

Assistant Principal McElroy also testified that with few exceptions, the General Education classes were not integrated with the ESL-designated classes for core curriculum, and only rarely integrated for specials. Specifically, with regard to Kindergarten, he testified that KC-Gen., taught by Ms. Prudhomme, was "self-contained," which meant that the students in that class "stayed with that teacher for the reading, language arts, social studies and science core, what we call core curriculum all day." *Id.* at 242. For KA-ESL and KB-ESL, Ms. Chance and Ms. Wood during most of the 2005-2006 school year "swap[ped]" students, one teaching math and science and the other reading and language arts. *Id.* He testified that KA-ESL and KB-ESL students did not integrate for core curriculum with General Education classes, and as to specials, only integrated on certain occasions for physical education. *Id.* at 243. He testified that as to First Grade, Ms. Walsh's 1A-ESL was "self contained," and did not integrate for core curriculum with MA1-Gen., MA2-Gen.,

or MA3-Gen.  Assistant Principal McElroy testified that the mixed-age classes switched students

back and forth throughout the day for core curriculum, but never with 1A-ESL.  He testified that 1A-

ESL did not integrate with the General Education classes for specials, except for physical education

on certain occasions.  He testified to a similar pattern for Second Grade.  As to the remaining grade

levels, Assistant Principal McElroy testified that none of them was self-contained.  Instead, they

engaged in "departmentalized teaching," whereby the students assigned to a particular homeroom

would move together throughout the day from teacher to teacher for their instruction.  *Id.* at 246.

He testified that even with departmentalized teaching, the students in the ESL-designated classes

never received instruction in the core curriculum classes with the students in General Education

classes, and rarely integrated for specials, and then only for physical education.  Again, the class

schedules produced by DISD and the testimony of Preston Hollow teachers Ms. Leon, Ms. Walsh

and Ms. Schill, confirm Assistant Principal McElroy's testimony regarding lack of integration.  *See*

Pl. Ex. 112, 174.

Based on his numerous years as an educator, Assistant Principal McElroy testified that he

could think of no sound educational reason for Latino non-LEP and white non-LEP students to be

divided into different classrooms as they were at Preston Hollow, as there was no difference in their

language learning needs.  He testified that he believed that white neighborhood students were being

purposefully kept together.  Specifically, his trial testimony was as follows:

> Q.      Did you ever have the impression or did you ever conclude, based on what you had
>
>         seen, that there was someone out there purposely trying to keep these white
>
>         neighborhood students together?

A.      Yes.  I would like to note that over the years I have made – I have had several

impressions.  One of those impressions being exactly what you stated.

Tr. Vol. III-A, at 35.  He further testified that, in his opinion, minority students who indicated

"English English" on their HLS were placed in ESL classes only because of their race.  He testified

that even though Anglos were not a majority in 6C-Gen., every Anglo Sixth Grader was in that class

(until the Sixth Grade teachers, on their own, shuffled the classroom assignments to be more

integrated toward the end of the 2005-2006 school year).

Assistant Principal McElroy testified that the school counselor met with minority students

on a regular basis.  He testified the minority students felt stigmatized because of the class

assignments, and the counselor was "trying to affirm for them that, well, you're not any less smart

because of the color of your skin."  *Id.* at 56.  He testified that minority students raised concerns that

"they felt like the white students were smarter.  They tended to be in more advanced classes, that

sort of thing."  *Id.*  He further testified that the segregated classrooms led to alienation among the

ethnic groups and the students referred to one another as "The Mexicans, the Whites, and the

Neighborhood Kids" and had sports competitions using these titles.  *Id.* at 48-49.  He stated that he,

the counselor, some parents and several teachers believed the students used these classifications "as

a result of the way the classes were set up."  *Id.* at 48.

**E.      Testimony of Dr. Gilda Alvarez-Evans**

The court also heard testimony from Defendants' non-retained testifying expert, Dr. Gilda

Alvarez-Evans, DISD's Assistant Superintendent for the Multi-Language Enrichment Program ("Dr.

Evans").  The court found Dr. Evans's testimony highly credible and quite helpful to its role as

finder of fact.  Dr. Evans testified that she oversaw several departments for DISD, including the

Bilingual and ESL instruction program.  She had special expertise in the areas of Bilingual and ESL education, including methodology, curriculum and compliance with the laws of the State of Texas for these programs.  She reported directly to Dr. Denise Collier (DISD's Deputy Superintendent for Curriculum and Instructional Services), who in turn reported to Superintendent Hinojosa.  At Dr. Collier's request, Dr. Evans looked into whether Doe #1, #2 and #3 were properly placed.  At the same time, she created a report of the classroom demographics at Preston Hollow, showing LEP and non-LEP enrollment using data from April 2006, including LPAC records.  *See* Pl. Ex. 277 at 4.  She testified that the numbers in her report approximated those in Principal Parker's chart from December 2005.  *See* Pl. Ex. 117.  She testified that her chart and Plaintiffs' Exhibit 117 both indicated that while Anglo non-LEP students were placed predominantly in General Education or mixed-age classes, minority non-LEP students appeared to be placed predominantly in the ESL-designated classes.  She testified that there were small groups of non-LEP Hispanic students in the mixed-age classes and large numbers of Anglo students (also non-LEP) in those classes.  She suspected a "screening mechanism" for entry in the mixed-age classes, such as tests, a DISD policy, or perhaps recommendations from prior teachers, but found none of these.  Tr. Vol. V-A, at 12-13.  With regard to First and Second Grade, she testified that in the 1A-ESL class, fourteen (14) of the nineteen (19) students were Latino compared to only four (4) Latino students in MA2-Gen.  Of the fourteen (14) Latinos in 1A-ESL, eight (8) were non-ELL.  In her report of campus findings, she stated:

> There are too many classes per grade level designated as ESL for the number of students who need ESL instruction.  For example, in grade K, there are 6 ESL students and 3 ESL teachers. . . . There are three multi-grade classrooms of grades 1 and 2, as well as two multi-grade classrooms for grades 3 and 4.  There is a large number of white students in each class, ranging from 8 to 18, in these classes.  By

contrast, there are small groups of non-ELL Hispanic students in
these classes, ranging from 2 to 6.

Pl. Ex. 277 at 1.  With regard to her campus findings, Dr. Evans expressed the following concern:

"What is the rationale for the multi-grade classes?  What criteria are used for placing students in the

multi-grade classes?"  *Id.*  She testified she had found no answer to these questions, though she did

not inquire of Principal Parker.

As to exited-LEP students, Dr. Evans testified that the two-year monitoring period can occur

in a general education class.  Dr. Evans testified that "the monitoring [of an exited LEP student] can

be done by whoever the classroom teacher is."  Tr. Vol. IV-B, at 242.  As of April 13, 2006, LEP-

exited students (all in the Third through Sixth Grade) comprised 75 of the 618 students at Preston

Hollow.  Pl. Ex. 277 at 3.  Dr. Evans testified that students generally exit LEP at the end of the

school year.  The student profiles for Grades 3, 4, and 6 show that at Preston Hollow a large number

of LEP-exited students were not exited until after the new school year began and after classroom

assignments were made.  Pl. Exs. 200, 205, 207.

Doe #1 was exited from LEP on September 13, 2005.  He remained in an ESL-designated

class with sibling Doe #2 for the 2005-2006 academic year.  Given her general understanding that

siblings are usually separated, Dr. Evans testified that she had concerns about the placement of

brothers Doe #1 and Doe #2 in the same class, 5A-ESL.  Dr. Evans inquired of Principal Parker as

to why the boys were together, and "[Principal Parker] said that the boys had a very good

relationship and so it was appropriate to put them together."  Tr. Vol. V-A, at 15.  Dr. Evans also

noted that based on Doe #3's Woodcock Muñoz score in First Grade, a "4,"  she "would not be

limited English proficient."  *Id.* at 24.  Doe #3 was placed in Bilingual classes for First and Second

Grade and in an ESL-designated class for Third Grade.

**Memorandum Opinion and Order - Page 33**

F.        "Racially Identifiable Hallways"

The court heard testimony and was presented with evidence that predominantly minority classrooms are, in some grades, physically separated in different hallways from the predominantly Anglo neighborhood classes.  Assistant Principal McElroy testified that Preston Hollow had "racially identifiable hallways" as one walked through the school.  Ms. Leon provided similar testimony, explaining that her 4A-ESL class was in a different hallway from the predominantly Anglo mixed-age neighborhood classes.  Plaintiffs' Exhibit #3, a map of the main building on Preston Hollow's campus, shows that classrooms that were predominantly Anglo were clustered together in different hallways than classrooms that were predominantly minority.  For example, Ms. Wells's MA1-Gen. class was in Room 44, Ms. Veal's MA2-Gen. class was in Room 43, and Ms. Schill's MA3-Gen. class was in Room 42.  These predominantly Anglo classes were located on one central hallway.  Ms. Walsh's 1A-ESL class was in Room 16, in a separate hallway alongside the First Grade bilingual classes (rooms 17 and 18) and Ms. Chambers's 3A-ESL class (Room 19), which was approximately 95 % minority.  The parties stipulated that "[d]uring the 2005-2006 school year, the mixed-age general education classes for first and second grade students were located next to each other down a hallway in the school building."  Pretrial Order ¶ 28.  Similarly,  MA4-Gen., taught by Ms. Humphress, was in Room 36 and MA5-Gen., taught by Ms. Grimm, was in Room 37. Rooms 36 and 37 were together in a different hallway than the classes made up of predominantly minority children for the same grades.  Class 4A-ESL, taught by Ms. Leon, was in Room 32 and 4B-ESL, taught by Ms. Bias, was in Room 29.  Rooms 32 and 29 were on a different hallway from Rooms 36 and 37.  Pl. Ex. 3.  Class KC-Gen., taught by Ms. Prudhomme, was in a separate building from KA-ESL and KB-ESL.  *See id.*

### G.      Veronica Perez (Computer Records Clerk)

On the final day of trial, August 21, 2006, the court heard the testimony of Ms. Perez, computer records clerk at Preston Hollow for twelve (12) years.   She testified that her responsibilities included taking CILT's final roster of classroom assignment recommendations, keying it in, and printing out the roster for Principal Parker.  On direct examination, Ms. Perez provided the following testimony regarding the Sixth Grade roster that CILT-member and Sixth Grade teacher Ms. Binfield recommended for the 2005-2006 school year:

Q.      Okay.  So after Ms. Binfield submitted the recommendation, did you produce a roster to Principal Parker?

A.      Yes, sir.

Q.      Okay, and was the roster approved by Principal Parker?

A.      No, sir.

Q.      To your knowledge, why was the roster not approved?

A.      The classrooms weren't set properly.

Q.      What was the reason why the classrooms were not set correctly?

A.      The neighborhood Anglo children were spaced out.

Q.      And who – who made that comment?

A.      It was in Ms. Parker's office and Ms. Parker and Ms. Curtis were in there.

Q.      So just to be clear, it wasn't approved because the neighborhood children in the sixth grade were spread out?

A.      Exactly.

Q.      Were the subsequent changes made?

The Court: Wait a minute.  What do you mean by saying – you said they were spread out or not spread out?

The Witness: They were spread out.

The Court: What do you mean the Anglo children were spread out?

The Witness: There was an even amount in every classroom.

The Court: When you say there was an even amount in every classroom, tell me what you mean.

The Witness: An even amount of Anglo children placed in all three sixth grade classrooms.

The Court: Go ahead, Mr. Hinojosa.

Q. Once the changes were made, how were the Anglo children divided, if any, among the classes?

A. They were all placed together.

Q. Was that class 6C?

A. Yes, sir.

Q. And that is a general class?

A. Yes.

Q. In prior years, what were the KD and KE classes?

A. They were predominantly white children.

Q. Were those also referred to as general education classes?

A. Yes, sir.

**Memorandum Opinion and Order - Page 36**

Tr. Vol. VIII, at 76-77.[28]   When asked who had the "final authority to approve or disapprove" of

CILT team recommendations, Ms. Perez testified that Principal Parker had that authority.  *Id.* at 75.

Following Ms. Perez's testimony, Principal Parker's attorney called her back to the stand.

She testified that Ms. Binfield and Ms. Curtis collectively prepared the "final roster" for the Sixth

Grade and that she never overrode Ms. Binfield's recommendations regarding the Sixth Grade roster

for the 2005-2006 school year, and to her knowledge never overrode Ms. Curtis's recommendations

or made any changes with regard to the roster discussed by Ms. Perez.  *Id.*  at 103-04.

Ms. Perez also testified that she was not aware of any Student Placement Cards being

destroyed during the summer of 2005 related to a sprinkler malfunction.  She testified that she had

destroyed the 2004-2005 Student Placement Cards, which were the Student Placement Cards used

for the 2005-2006 school year, and did not know where the 2005-2006 Student Placement Cards

were.  She testified that she believed the sprinkler malfunction was in the basement, and not in her

office where the records were kept.

### H.      Preston Hollow Parent Teacher Association

Preston Hollow has a Parent Teacher Association ("PTA").  During the 2005-2006 academic

year, Alice "Meg" Davis Bittner ("Ms. Bittner") served as President of the PTA.  She testified that

she will serve as President during the 2006-2007 school year.  She served as Secretary during the

2004-2005 school year.  Her children attended Preston Hollow and were in neighborhood classes.

---

[28]On cross examination, Ms. Perez testified that she left the roster on Principal Parker's desk and did not hand it to her in person.  In response to counsel for Defendants' question, "[D]id you have any personal knowledge as to why Ms. Parker changed the roster?", she testified that she did not.  Tr. Vol. VIII, at 82.  When asked whether she had "any direct conversations with Ms. Parker as to why she changed the roster," Ms. Perez stated that she did not.  *Id.*

The PTA Board consisted of Ms. Bittner, Tara March, Kaky Wakefield and Carol Crowling, all of whom are Anglo.[29]  Principal Parker was an *ex officio* member of the PTA.

In her testimony Ms. Bittner revealed that as President of the PTA, she was vocal in her effort to stop white flight by attracting Anglos back to Preston Hollow.  She testified that her Anglo neighbors did not want to send their children to Preston Hollow because their children would be a minority.

### 1.    The Brochure and Photo Shoot

In or around November 2005, the PTA decided to produce a brochure about Preston Hollow, which was approved by Principal Parker.  A photo shoot for the brochure was planned for November 2005.  Ms. Grimm and Ms. Humphress, both teachers in the predominantly Anglo mixed-age classes (MA4-Gen. and MA5-Gen.), were given release forms to give to parents for the photo shoot.  No release forms were provided to the teachers of ESL-designated classes.

In an e-mail response to Preston Hollow teacher Graciela McKay regarding the photo shoot, Ms. Bittner stated that the "purpose of the brochure is to get more of our immediate neighborhood families that live in big, expensive houses, to reconsider those private tuitions and send their kids to us."  Pl. Ex. 248.  Ms. Bittner's e-mail further provides:

> While our demographics lean much more Hispanic, we try not to focus on that for this brochure.  A big question that neighborhood parents have is about the ethnic breakdowns of our school population. Our neighbor[hood] school, being mostly Hispanic, throws the neighborhood families off a bit.  If I can get more neighborhood families, my PTA membership goes up, the fundraiser makes more and we have a good donor base for more of our projects. . . . I just

---

[29]Although Ms. Bittner was not a party to the lawsuit, her personal lawyer, Mr. John Schorsch, accompanied her to trial.  Ms. Bittner's attorney readily sat at the table with counsel for Defendants and passed several notes to one of Defendants' counsel. This, along with her testimony, indicates to the court that Ms. Bittner aligns herself with Defendants and is comfortable with the position asserted by them in this lawsuit.

>don't want any hurt feelings if we use one or two Hispanic kids in the
>shot.

Pl. Ex. 248.

When questioned about this e-mail and other e-mails, Ms. Bittner exhibited numerous convenient lapses in memory, was reluctant to answer questions posed in a straightforward manner, and at times gave contradictory testimony. For example, when Defendants' counsel asked her what she meant in the e-mail by "immediate neighborhood families," she testified, "I guess I don't know what I meant by immediate. I don't know what I meant by immediate. I can't tell you, when I wrote this in November, exactly what I meant by immediate." Tr. Vol. IV-B, at 105. In her testimony earlier that day, however, she used the words "immediate neighbors" in responding to a question by Plaintiffs' counsel, indicating her familiarity with the term:

Q.    (By Mr. Bernal) Ms. Bittner, how many of your neighbors send their children to Preston Hollow Elementary?

A.    I guess you need to define neighbors. Immediate neighbors?

Q.    Sure. Immediate neighbors.

A.    None.

Tr. Vol. IV-A, at 80. Another example of her recalcitrance on direct examination took place when she was asked what she meant by the portion of her e-mail that said, "[o]ur neighbor school, being most Hispanic, throws the neighborhood families off a bit," she testified that she did not know what she meant by her words "throws the neighborhood families off a bit," and did not recall what she meant when she wrote it. Tr. Vol. IV-B, at 118. Ms. Bittner was generally not forthcoming when asked questions regarding the e-mail. The following is another example of how difficult it was to get a straight and direct answer from Ms. Bittner:

Q.      Handing the witness Plaintiffs' Exhibit No. 248, Ms. Bittner, do you recognize this document?

A.      Yes.

Q.      You have seen it before?

A.      At my deposition, yes.

Q.      Do you have any reason to believe it is inaccurate in any way?

A.      Yes.

Q.      Tell the Court what that belief is based on.

A.      First, this was a string of e-mails with Mrs. McKay.  That first, I don't have my original e-mail, so I can't verify that this was my e-mail sent.  I can tell you that this response on the bottom appears to have been taped in.  It was not her full response.  This is a fabrication and this is not – not true.

Q.      Okay, let's go piece by piece and we will talk about it.  At the very top we have a "from" filled in with your name; is that correct?

A.      Yes.

Q.      And is that your correct e-mail address?

A.      Yes.

Q.      And below it there is a "to" field; do you see that?

A.      Yes.

Q.      And next to that is the name Graciela McKay?

A.      Yes.

Q,     And what appears to be an e-mail address for Ms. McKay.  Do you recognize that e-mail

       address?

A.     I do not know her e-mail address, no.

Q.     Do you have any reason to believe this e-mail address isn't correct?

A.     I have no reason to believe, no.

                                        * * *

Q.     Do you have any reason [to believe] that that part of this document, that that message was

       not transmitted on November 17, 2005, as it states above?

A.     I cannot speak if this is my e-mail or not.

                                        * * *

The Court:    [. . .] The question as far as I am concerned is fairly straightforward.  The question

              is whether or not - - I will go ahead and cut to the chase, the body of that document,

              that starts with "I will" [and] ends with "Meg," that is what the inquiry is about.

                                        * * *

              The bottom line is, whether or not Ms. Bittner, you sent the e-mail or is that

              something you generated.  That is what he is going to.  It goes to the heart of the

              issue we are trying to decide.

The Witness:  I guess I am saying I can't be sure this is the e-mail I sent.  I don't have it.  I don't

              keep it.  I don't know.  I am looking at this cut and paste and this on here.  I mean I

              don't know that this wasn't fabricated, and I cannot say within [a] hundred percent

              is this an e-mail that I sent.

**Memorandum Opinion and Order - Page 41**

Q.      Ms. Bittner, is your testimony that the words starting with the word "I" and going down to

        your name "Meg," are you saying that you are not sure whether or not these are your words?

A.      I guess I can't be sure.  I don't know how to answer that.  I am confused because I can't tell

        you if this is the e-mail I sent.

The Court:      Let me ask you this.

The Witness:    I have never seen this sheet of paper except in my deposition.

The Court:      Excuse me.  Let me ask you this then.  Have you ever seen that e-mail before[,] the

        one we are referring to.

The Witness:    Until my deposition as a whole, I have seen a redacted version of this e-mail at a

        PTA meeting that was trying to be handed out.  I had never – I do not have a copy

        of this full e-mail anywhere.

The Court:      You said you cannot be certain.  Would you say it is more likely or less likely that

        that is an e-mail you generated?

The Witness:    More likely because I did e-mail Ms. McKay regarding the brochure in response to

        an e-mail she had sent me.

The Court:      All right, proceed, Mr. Bernal.

Tr. Vol. IV-A, at 92-96.[30]

It insults the court's intelligence for Ms. Bittner to refuse to acknowledge that the e-mail set

forth in Plaintiffs' Exhibit 248 was her reply to an e-mail sent to her by Graciela McKay, and to

testify that she did not know what she meant by certain phrases in the e-mail.  Further, even though

she stated in the e-mail that the purpose of the brochure was "to get more of our immediate

---

[30]The record reflects that Ms. Bittner was much more cooperative and responsive to Defendants' counsel's
questions than to Plaintiffs' counsel's questions.

**Memorandum Opinion and Order - Page 42**

neighborhood families that live in big, expensive houses, to reconsider those private tuitions and send their kids to us[,]" (Pl. Ex. 248), at trial she testified that the purpose of the brochure "was as a handout for what we were trying to put together[,] a playground grand opening event, after school event."  Tr. Vol. III-A, at 100.

Ms. Gonzalez testified that after Ms. McKay showed her the e-mail (*see* Pl. Ex. 248), she was upset because the e-mail indicated to her that the PTA President sought to downplay the presence of Latino children at Preston Hollow.  Ms. Gonzalez and other Latino parents on the day of the photo shoot approached Principal Parker on the playground and inquired about the photo shoot.  She told the Latino parents to wait while she went to look for the photo shoot.  When she did not return, the Latino parents went to look for the photo shoot themselves.  The photo shoot was in a mixed-age class, and Principal Parker was standing outside the door.   Ms. Bittner also testified that Principal Parker was standing outside the door of the mixed-age classroom during the photo shoot.

Ms. Walsh also testified that, in her role as inside track representative, other teachers had expressed concern to her about a brochure for the school where "only certain kids were going to get photographed for it . . . and [the teachers] felt that the brochure should be as diverse as the school is."  Tr. Vol. IV-A, at 58.  Ms. Walsh testified that she was concerned when she saw the brochure and she did not think the brochure was an accurate representation of Preston Hollow because "[n]ot all, but most of the children on the brochure were Anglo."  *Id.*  On December 1, 2005, Assistant Principal McElroy wrote an e-mail to Principal Parker which stated: "It has come to my attention that my children were possibly used as 'tokens' for the photo shoot for the PHE brochure."  Pl. Ex. 226.  The court has reviewed the brochure.  *See* Pl. Ex. 247.  Based on its review, the court agrees

with Ms. Walsh's assessment of the brochure.  The court further notes that the brochure does not even come close to being representative of the ethnic makeup of the student body at Preston Hollow during the 2005-2006 academic year, which, as stated before, was  approximately 18% Anglo, 66% Latino, 14% African-American, and 2% Asian.

With regard to the actual brochure, Ms. Bittner testified that Principal Parker reviewed the contents of the brochure prior to its final production.   The photo shoot was on the Preston Hollow campus and was approved by Principal Parker.  The brochure was distributed from the office of the school, even though at a December 2005 meeting with Latino parents Principal Parker informed them that the brochure would not be further distributed because of their stated concerns that it was not representative of the ethnic makeup of the school.  Principal Parker told the Latino parents that another brochure, which would be more inclusive, would be produced, but it never was.

### 2.      Tours of Preston Hollow

The PTA gave tours of Preston Hollow to prospective neighborhood parents.   The prospective parents visited the neighborhood classes, but did not visit the predominantly minority ESL-designated classes.  Ms. Leon testified that during the entirety of the time she taught 4A-ESL, no tours were given of her room.  When she taught mixed-age classes from 1995-2001, however, prospective parents visited her classes on tours of the school.   Ms. Schill provided similar testimony, stating that when she taught ESL-designated classes, no tours were given of her classes. When she taught mixed-age classes, prospective parents were brought by on tours to visit the class. Regarding the tours for prospective Anglo parents, Ms. Walsh stated: "They go to the kindergarten classes that have the Anglo children.  They go to the mixed age classes, and then they go to the special classes, and the library, and the cafeteria."  Tr. Vol. IV-A, at 30.  She also testified that her

conversations with other Preston Hollow teachers confirmed her impression that the tours were conducted through only those classrooms that were predominantly white.

The tours were generally conducted by PTA members.  Prior to the tour, the visitor had to check in at the main office and, following the tour, would usually visit with Principal Parker. Principal Parker had the responsibility to decide when and how people could tour Preston Hollow. Moreover, an e-mail from Ms. Bittner to Principal Parker suggests that Principal Parker has some involvement with the parent tours at Preston Hollow.  *See* Pl Ex. 124.[31]

## I.        "Open House," "Kindergarten Round-up" and "Turnover Dinner"

Ms. Walsh testified that the mixed-age classes had their own "open house" during the first week of school at Preston Hollow, separate from the open house and hot dog supper for the entire school held in September.  Ms. Walsh testified that the PTA and Principal Parker coordinate school open houses.

In addition to a separate open house, Ms. Walsh testified about a separate "kindergarten round-up" for the neighborhood parents, the purpose of which was to attract more neighborhood parents to send their children to Preston Hollow.  A round-up is for pre-Kindergarten and Kindergarten students to register for the following year.  She testified that the postcard invitation for the special Kindergarten round-up was not distributed to teachers to put in the Tuesday folders (which is the normal procedure), but instead was handed out in the carpool line, where neighborhood parents generally pick up their children after school.  The invitation provided the name and address

---

[31]The e-mail is from Ms. Bittner to Principal Parker dated May 3, 2006 and provides: "I just got a call from someone that would like a tour and a meeting with you on Monday or Tuesday of next week.  Please let me know which day is best and what time.  (They were open to any time.)  If I[']m going to be there, I teach yoga on Monday until 10:30. Tuesday is open.  Let me know.  Meg."

of the school, and the school phone number, and also stated that Principal Parker would be present at the round-up.

Ms. Walsh testified that the PTA held its annual turnover dinner (where it selected the officers and directors for the following year) at the home of one of its officers and charged $15 to attend. Ms. Walsh testified that at other schools where she had taught, the turnover dinner was held at the school and did not cost money.

### J.    Principal Parker

Principal Parker testified that children in ESL-designated classes receive a general education, regardless of whether they are LEP or non-LEP. She testified that students in ESL-designated classes receive the same curriculum as general education students. She testified that an ESL-designated class primarily serves ESL students and can include LEP and non-LEP students. Principal Parker further testified that ESL strategies and methodologies are used in all classes at Preston Hollow. Principal Parker testified that Anglo children with "English/English" on their HLS were assigned to general education classes because they were not LEP. At no point in her testimony did she provide an explanation why minority children with "English/English" on their HLS were disproportionately assigned to ESL-designated classes, rather than general education classes, even though they, too, were non-LEP.

Principal Parker testified that she was ultimately responsible for classroom assignments at Preston Hollow. She stated that at the beginning of each school year, the process for assigning students to classrooms involves the teachers completing student placement cards for students in which a teacher recommends a pupil's classroom and teacher for the following year, and submitting the cards to the front office. The cards then go to the CILT committee. The CILT committee

considers a student's grade level, age, report cards, attendance, teacher recommendation and diagnostic test scores.  The LPAC's recommendation regarding placement (namely, whether a student is LEP or non-LEP) is one factor that is taken into account in making student classroom assignments.  Principal Parker testified that class size mandates are adhered to in making classroom assignment at Preston Hollow.  Other than the state-mandated maximum of twenty-two (22) students per class in grades Kindergarten through Fourth Grade, she testified that the state shows leniency with regard to class size in the Fifth and Sixth Grades, "but probably 31 or 32 students would be unacceptable to the state."  Tr. Vol. VII-B, at 331.  She testified that based on the numbers set forth in Plaintiff's Exhibit 117, which she had prepared, all classes were below the state-mandated maximum, with the exception of MA-5-Gen.  *Id.*  She further testified that student progress is considered in making classroom assignments and includes teacher information, report cards and standardized tests.  With regard to students enrolling after the school year has commenced, Principal Parker stated that Preston Hollow orders the student records from the previous school the child attended.  She evaluates the information and consults with a CILT member regarding placement prior to making her final decision as to the classroom assignment of these late-enrolling children.

Principal Parker further testified that Ms. Gonzalez never asked her to transfer her child to another classroom and that she had no information that Ms. Gonzalez's child was not receiving appropriate educational instruction at Preston Hollow or was not progressing or achieving at Preston Hollow.  Principal Parker similarly testified that Ms. Santamaria never requested that she transfer Does #1, #2 and #3 to a different classroom at Preston Hollow, or that the educational progress of Does #1, #2 and #3 was not satisfactory.

Counsel for Defendants questioned Principal Parker about Ms. Gonzalez's testimony that she had told Gonzalez that "the children were assigned to [LEP] classes according to their origin and from what country they came from." *See* Tr. Vol. I-A, at 116. Specifically, her attorney asked her if she "ever ma[de] a statement in a public forum, in a parent meeting, in front of DISD officials, that would indicate to the parents that their children are being put into ESL or bilingual programs because of their race or national origin?" Tr. Vol. VII-A, at 130. Principal Parker responded, "No." *Id.* Principal Parker also testified that she had never told Ms. Santamaria that her children were assigned to classes based on national origin. *Id.* Principal Parker testified that she has never made a decision to assign a student to a particular classroom based on race or national origin. She denied that she had ever made statements indicating to parents that their children were being placed in ESL or bilingual programs at Preston Hollow based on race or national origin.

### 1.    Principal Parker's Demeanor and Credibility as a Witness

Unlike the testimony of Ms. Leon, Ms. Schill, Ms. Walsh, and Assistant Principal McElroy, all of whom the court found highly credible and sincere, Principal Parker's testimony at times lacked credibility, was evasive and  confusing, and, as demonstrated by Plaintiffs' counsel at the trial, varied at times from her May 2006 deposition testimony and her May 3, 2005 affidavit submitted by Defendants in response to Plaintiffs' motion for preliminary injunction. The court also finds that Principal Parker appeared to be feigning ignorance with regard to certain questions and had trouble giving a straight answer. For example, Principal Parker testified that she did not know what the term "neighborhood classes" meant. Only after further questioning did she testify that she had, in fact, heard Preston Hollow staff using the term, but did not know what it meant. She was also evasive when asked whether the immediate neighborhood around Preston Hollow was predominantly Anglo,

a fact testified to by the teachers and Assistant Principal McElroy.  The following is a brief excerpt from Principal Parker's testimony on cross-examination.

Q.      Ms. Parker, would you agree with me that the area immediately surrounding Preston Hollow in the immediate vicinity is primarily white?

A.      Are you speaking about the attendance zone at Preston Hollow?

Q.      No, ma'am.  I'm talking about the areas immediately surrounding Preston Hollow.

A.      And what was the question?

Q.      Would you agree with me that the area immediately around Preston Hollow is a predominantly white neighborhood?

A.      I wouldn't know for sure.

Q.      Have you had the opportunity to drive through that neighborhood on the way to work?

A.      I don't drive through that neighborhood on my way to work.

Q.      So it's your testimony today that you have never observed whether or not the neighborhood immediately around Preston Hollow is predominantly white, or predominantly black, or predominantly Hispanic?

A.      I indicated that I don't drive through that neighborhood to come to work.

Q.      So you have no knowledge as to that?

A.      No.

Q.      Would you agree with me that the children you know of that attend your school at Preston Hollow that come from the neighborhood immediately around Preston Hollow, would you agree with me that those children are predominantly white?

A.      I don't know where all the children live, so I wouldn't be able to speak to that.

Q.      Have you ever heard anyone refer to the term, the neighborhood students?

A.      All our students are neighborhood students.

Q.      You've never heard anyone at Preston Hollow, teachers, administrators, parents, ever refer to a particular subsection of the students at Preston Hollow as neighborhood students?

A.      In the testimony that I've heard here, they have testified that there are neighborhood – they are referr[ing] to neighborhood students.

Q.      Other than the testimony that you heard at this trial, how long — first of all, how long have you been the principal at Preston Hollow?

A.      Five years.

Q.      Okay, other than the testimony that you heard at this trial, is it your testimony today that you have never heard of the term, neighborhood students?

A.      I've heard staff refer to neighborhood students.

Q.      And what was your impression as to what the staff was talking about when they used the term neighborhood students?

A.      I'm not exactly sure.

Q.      Is it your testimony that your impression was that they were talking about all the students at Preston Hollow because they are all, to you, they're all neighborhood students?

A.      I don't really know that I had an impression one way or the other.

Tr. Vol. VII-A, at 131-34.[32]

---

[32]At her deposition, she was asked:
"Q.      So have you ever heard anything being referred to as a neighborhood class at Preston Hollow?"
"A.      No."
*Id.* at 135-36.

In the face of testimony by Ms. Leon, Ms. Schill, Ms. Walsh, Assistant Principal McElroy and even Ms. Bittner that "neighborhood classes" was the name commonly used for the General Education classes that were made up primarily of the Anglo children living in the immediate Preston Hollow neighborhood, the court quite simply does not believe Principal Parker's testimony that she did not know what was meant by "neighborhood classes" or "neighborhood students," and that she was not aware whether the immediate neighborhood surrounding Preston Hollow was predominantly Anglo. Indeed, the court finds it astounding that Principal Parker, who has served at Preston Hollow for five (5) years, would testify that she knows nothing about the ethnic makeup of the immediate neighborhood surrounding her school. This testimony simply does not square with common sense, reason, and what a principal would reasonably be expected to know about the neighborhood in which his or her school is located. Moreover, the evidence shows she knew enough about "neighborhood classes" to meet with the PTA and inform them that Ms. Prudhomme would be the teacher for the Kindergarten neighborhood class in the 2005-2006 school year. *See* Pl. Ex. 243.

With regard to whether Doe #1 received ESL instruction in his ESL-designated class during the 2005-2006 academic year, in her affidavit submitted in response to Plaintiffs' motion for preliminary injunction, Principal Parker stated that even though Doe #1 was in an ESL-designated class that "serves [ESL] students[,] . . . Doe #1 does not receive ESL instruction. . . . Doe #1 receives general education instruction in English from an ESL-certified teacher." Parker Aff. ¶ 8. At trial, she testified that while Doe #1 did not receive ESL instruction in his ESL-designated class, his instruction included ESL "methodologies and strategies." Tr. Vol. VIII, at 40. In response to

questioning regarding ESL instruction, Principal Parker testified that the problem was "a matter of semantics" with the definition of ESL instruction. *Id.* at 44.

In explaining why student placement cards were not produced to Plaintiffs, Principal Parker testified that student placement cards that were used to determine student placement in the 2005-2006 academic year were destroyed in a sprinkler malfunction when fire sprinklers were being installed in the vault of the building. Veronica Perez, Preston Hollow's Computer Records Clerk, testified that the student placement cards were kept in her office, that the 2004-2005 student placement cards were the ones used to determine student placement in the 2005-2006 academic year, and that she personally had destroyed those student placement cards. She also testified that no records in her office were destroyed to the best of her knowledge in her office, and that she believed the sprinkler malfunction was in the basement. Principal Parker testified on rebuttal that the sprinkler malfunction took place in the main office and destroyed a box in Ms. Perez's office that likely contained the 2004-2005 student placement cards.

The court also found Principal Parker's responses to its relatively straightforward questions regarding the rationale for classroom assignments of African-American non-LEP students to be strained, nearly incomprehensible and nonresponsive to the court's inquiry:

The Court:     Tell me what the explanation is for African-Americans being in ESL classes?

The Witness: Part of it has to do with the time in which the students enroll and all of our classes have African American students in them with the exception of bilingual classes, but the mobility of our African American population this year having some students come to us late in the year from Wilmer Hutchins and having students as a result of Hurricane Katrina, that is where the largest percentage of African-American

population came from.  Those students – let me qualify that.  Those students that

came in late – late meaning some of them came in as late as October.

Tr. Vol. VII-B, at 289-90.  Principal Parker never explained to the court why African-American

students (who, for the most part, are non-LEP) were assigned to ESL-designated classrooms,

whereas their Anglo counterparts were almost always assigned to the General Education classes.

With respect to Principal Parker's response regarding late entry of African-American students, the

student profiles show that of the forty-seven (47) African-Americans assigned to ESL classes, only

fourteen (14) came in after the beginning of the first day of school in mid-August 2005 and of those

fourteen (14), nine (9) came into the school after September 30, 2005.   The court takes judicial

notice under Fed. R. Evid. 201 that Hurricane Katrina made landfall on the Gulf Coast and New

Orleans on the morning of August 29, 2005.

Principal Parker testified that she never overrode a CILT member's recommendation.  This

testimony is contradicted by the testimony of both Assistant Principal McElroy and Ms. Perez.  As

summarized above, both testified that Ms. Binfield (a Sixth Grade teacher and CILT member)

submitted classroom assignments for the Sixth Grade classes for 2005-2006 where she tried to

divide up Anglo children evenly among the three (3) classes, 6A-ESL, 6B-ESL and 6C-Gen.  The

teacher-recommended assignments were changed and resulted in assignments that were segregated

with all the Sixth Grade Anglo children assigned to 6C-Gen.  It is undisputed that Principal Parker

has the last say in student classroom assignment for the sixth grade (and all other grades).  It is also

undisputed that Ms. Perez input the roster recommended by Ms. Binfield, where Anglo students

were spread evenly among the Sixth Grade classes, and then placed it on Principal Parker's desk.

She then received back a changed roster where all the Anglo children were assigned to 6C-Gen.

Principal Parker testified that she did not recall Ms. Binfield recommending student placements for Sixth Grade. She testified that she did not recall making any changes to the Sixth Grade roster, and that Ms. Binfield and Ms. Curtis (who was not even a CILT member) decided to assign all Anglo students to 6C-Gen. Having observed the demeanor of the witnesses, the court finds Ms. Perez's and Assistant Principal McElroy's testimony more credible than that of Principal Parker. Given that Principal Parker is the final decisionmaker with regard to classroom assignments, it strains credulity for the court to reject Ms. Perez's and Assistant Principal McElroy's respective accounts, and to accept Principal Parker's testimony that she had nothing to do with changing the final roster for Sixth Grade in a way that resulted in all Anglo children being assigned to the general education class. The court further notes that Defendants presented the court with no reason to question Ms. Perez's or Assistant Principal McElroy's testimony, or to impeach either witnesses' credibility.

### 2.      Principal Parker's Post-Litigation Conduct

The court heard testimony from numerous witnesses regarding questionable actions taken by Principal Parker after this litigation was commenced. These actions, set forth below, all have one thing in common – *their practical effect was to give the classes at Preston Hollow the appearance of being less segregated than they were.* For example, Assistant Principal McElroy testified that the classroom assignments at Preston Hollow were "reshuffled"[33] in anticipation of a visit by Frances Guzman (who, upon Plaintiffs' request, was permitted by the court over counsel for Defendants' vigorous objections to visit Preston Hollow for three (3) days to observe the classrooms). Specifically, he testified that Ms. Prudhomme's KC-Gen. class, which was predominantly Anglo,

---

[33]"Reshuffling," as used by various witnesses, means to the court that students were moved from the classroom to which they were normally assigned during the 2005-2006 academic year to another classroom.

was redistributed after Principal Parker sent her away that day to attend a seminar of which she was not aware until the last minute.  As part of the redistribution of students, several Anglo students from KC-Gen. were sent to KA-ESL and KB-ESL.  Assistant Principal McElroy also testified that certain Fifth Grade students were moved by Ms. Curtis, the 5B-ESL teacher, and that Ms. Pickens, the 5A-ESL teacher, expressed concerns about the redistribution.  Defendants did not rebut this testimony.

Assistant Principal McElroy also testified that Principal Parker attempted to plan the first ever "Shadow Day" at Preston Hollow to coincide with Ms. Guzman's visit.  On that day, children would spend the day visiting the grade-level they would be in the following year.  He testified, however, that Shadow Day never took place.  Defendants did not rebut this testimony.

Ms. Schill testified that Principal Parker altered the graduation ceremony at the end of the 2005-2006 academic year from the way it was conducted in prior years.  Instead of having the students come to the stage by class, the children came to the stage by grade in alphabetical order.  Defendants did not rebut this testimony.

With regard to CILT, Assistant Principal McElroy testified, as did the teachers, that Principal Parker asked members of CILT to sign a confidentiality agreement after litigation began in this case.  Ms. Schill, a CILT member, testified that in the latter half of the 2005-2006 academic year, Principal Parker asked her to fill out a confidentiality agreement.  Defendants did not rebut this testimony.

Finally, following commencement of this litigation, Principal Parker announced that during the 2006-2007 academic year, Preston Hollow would no longer have mixed-age classes.  Although Assistant Principal McElroy exhorted her to end the mixed-age classes during the 2005-2006 school year, she did not announce that she would end these classes until after this lawsuit was filed.

### K.      Superintendent Hinojosa

Superintendent Hinojosa is ultimately responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of DISD employees.  He testified that Ms. Gonzalez approached him at the conclusion of a PTA meeting in approximately January 2006 and stated in Spanish she had an issue about which she wanted to speak to him.  Superintendent Hinojosa testified that he was busy trying to get to another meeting on the other side of town, and gave Ms. Gonzalez his business card and asked her to call his office.  He testified that he recalled receiving messages from his administrative assistant that Ms. Gonzalez was trying to follow up with him.  He testified that he did not personally return Ms. Gonzalez's call, but that in the normal course, his administrative assistant would return the calls and instruct the individual to "follow [DISD's chain of command]," which means that the individual would be referred back to the teacher, followed by the school principal, followed by the area superintendent, followed by Dr. Flores, who would then report to Superintendent Hinojosa.  Tr. Vol. III-B, at 195-96.

Superintendent Hinojosa testified that he received a February 9, 2006 letter from Preston Hollow teacher Graciela McKay informing him that "classrooms were segregated by race[,]" that "white students were divided into classrooms separate from minority students and the white students were generally receiving a better education."  *See* Pl. Ex. 179.  The letter further stated that the "administration at the school has acknowledged that separate classrooms are created for neighborhood white children.  This segregation is unfortunate and in violation of Title [VI] of the Civil Rights Act of 1964."  *Id.*  Superintendent Hinojosa forwarded the letter to Dr. Flores to check into the matter right away.  Although Superintendent Hinojosa testified that he did not remember exactly what he told Dr. Flores, he testified that he probably said, "[P]lease look into this matter

right away and ensure that everything is being handled appropriately, something to that effect." Tr.

Vol. III-B, at 198. Dr. Flores thereafter reported to Superintendent Hinojosa that Rene Martinez was

taking care of the allegations of segregation in Ms. McKay's letter, that Dr. Flores and Mr. Martinez

did not believe it to be a serious matter and that it was a parent wanting the principal removed, not

an issue in the classrooms. Mr. Martinez is the Parent Engagement Executive Director for DISD,

and he is responsible for fielding complaints from parents that do not speak English and addressing

their concerns. Superintendent Hinojosa testified that Mr. Martinez and Principal Parker had

worked together in the past. Dr. Hinojosa also instructed Dr. Denise Collier, the Deputy

Superintendent of Curriculum and Instruction for Area 4, and Dr. Evans, "to fix the problem." *Id.*

at 216. He testified that he told them that "[i]f they saw an issue that they felt needed to be

corrected, that they needed to fix the matter." *Id.* He also testified that he wanted the matter

handled because he thought there might be a quasi-programmatic issue with the Bilingual and ESL

students and wanted to be sure the District was delivering appropriate services in compliance with

Title VI. Superintendent Hinojosa testified that he reviewed an e-mail from Mr. Martinez to Barbara

Hardin, his administrative assistant at the time, from which he concluded that the matter had been

handled.

When asked whether he ever ordered training for Principal Parker as a result of Plaintiffs'

allegations, he testified that he had not. He explained:

> I have 240 principals. I order very little training for individual
> principals. We go through very elaborate professional development
> based upon the needs and based on our district goals. I have not
> directed any one principal [to get] training of all the principals we
> have in the district. I delegate that responsibility through Dr. Flores
> to the area superintendent who supervises them on a regular basis.

*Id.* at 211.

Superintendent Hinojosa testified that he was familiar with the term "white flight," and described it as occurring when "Anglos move out of communities that are predominantly minority" into more suburban areas that "are more homogenous to people like them." *Id.* at 168. He agreed with counsel for Plaintiffs that "white flight" also included Anglos removing their children from neighborhood schools in communities that are predominantly minority and sending them to private schools. *Id.* He testified that Preston Hollow experienced the latter form of "white flight," namely, where Anglos chose to send their children to private schools in lieu of the neighborhood school where the community was predominantly minority. *Id.*

**L.      Joe Campos**

Joe Campos, until July 2, 2006, was the executive manager for the national office of League of United Latin American Citizens ("LULAC"). After hearing the complaints of Ms. Santamaria and Ms. Gonzalez about Latino children being treated differently than Anglo students at Preston Hollow and receiving an unequal education, Mr. Campos visited the Preston Hollow campus. After hearing from the Latino parents and Principal Parker, based on his summary observations he concluded that Ms. Santamaria and Ms, Gonzalez were more or less disgruntled parents and "had a personal agenda." Tr. Vol. VII-A, at 62. According to Mr. Campos, Ms. Santamaria and Ms. Gonzalez "wanted Ms. Parker out." *Id.* Mr. Campos attended a second meeting at the school at Mr. Martinez's request, although he did not want to attend. With regard to Ms. Gonzalez's and Ms. Santamaria's complaints, Mr. Campos testified: "I [ . . . ] tuned the whole thing out. It was probably wrong of me, but I had already decided what the whole issue was all about, and I had other things on my mind that I was dealing with, and I just tuned it out." *Id.* at 63-64. Based on Mr. Campos's observations, LULAC decided not to represent Plaintiffs in this case.

That LULAC did not take the case is irrelevant to whether Defendants have violated the Fourteenth Amendment of the United States Constitution or Title VI of the Civil Rights Act of 1964. Although the court appreciates Mr. Campos's assessment of the events transpiring at Preston Hollow, the court does not rely on personal assessments or opinions to determine whether a violation of the law has occurred. Moreover, with regard to Mr. Campos's testimony that Ms. Gonzalez and Ms. Santamaria had a "personal agenda," the collateral personal motives or ill will of an individual is irrelevant if the underlying facts support a violation of the law.

## M.     Plaintiffs' Proffered Experts

In support of their claims, Plaintiffs offered testimony and "expert reports" of Dr. Richard Valencia and Frances Guzman.   Dr. Valencia's testimony was proffered by Plaintiffs to show, among other things, that segregation of minorities from Anglos in public education is harmful to minority children's self-esteem and causes them feelings of inferiority.  His testimony was also proffered to rule out possible pedagogical reasons for the manner in which Preston Hollow had been assigning minority non-LEP students differently than it assigned white non-LEP students. Specifically, he ruled out "language status as a pedagogical justification for the within school segregation at" Preston Hollow and "ability grouping."   After conducting a mathematical analysis of the data, he concluded that "the pervasive and robust within-school segregation is based on race/ethnicity." Supp. Report at 2.

Defendants have challenged Dr. Valencia's testimony on numerous grounds.  The court determines that Dr. Valencia's testimony and statistical analysis are fraught with flaws, and that major gaps in his evidence exist.  Accordingly, the court will not consider the testimony of Dr. Valencia.  In any event, the court determines that Dr. Valencia's testimony will not aid or assist it

in deciding whether there has been a violation of the Fourteenth Amendment or of Title VI.  *See*

*generally Bodzin v. City of Dallas*, 768 F.2d 722, 725 (5th Cir. 1985) ("The judge is the source of the

law and the only expert needed by [the trier of fact.]") (citation omitted).  Moreover, the court is

fully able to make the same mathematical calculations as did Dr. Valencia and apply them

accordingly.   Similarly, the testimony of Frances Guzman is not needed by the court, as sufficient

evidence is present from which the court can make its conclusions of law.[34]  In short, the court need

not reach the issue of whether Dr. Valencia or Ms. Guzman is qualified as an expert witness under

Fed. R. Evid. 702.

## III.    Conclusions of Law

### A.     "Case or Controversy Requirement"

The United States Constitution, Article III, section 2, clause 1, requires the existence of a

case or controversy to support a federal court's jurisdiction.  *Amar v. Whitley,* 100 F.3d 22, 23 (5th

Cir. 1996).  The case or controversy doctrine underlies the legal doctrines of both standing and

mootness. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC),* 528 U.S. 167, 180 (2000).

 Standing raises the issue of "whether the plaintiff is entitled to have the court decide the merits of

the dispute or of particular issues.  Standing is a jurisdictional requirement that focuses on the party

seeking to get his complaint before a federal court and not on the issues he wishes to have

adjudicated."  *Cook v. Reno*, 74 F.3d 97, 98-99 (5th Cir. 1996) (internal citations and footnotes

omitted).  Mootness is "the doctrine of standing set in a time frame: The requisite personal interest

that must exist at the commencement of litigation (standing) must continue throughout its existence

_____

[34]Ms. Guzman observed classes at Preston Hollow and interviewed students and teachers during the three-day period.  She also reviewed certain depositions of Preston Hollow teachers and administrators.  Defendants objected and argued that, among other problems with her testimony, there are insufficient facts or data to support Ms. Guzman's proffered opinion that non-LEP students in an ESL-designated classroom were being harmed academically.

**Memorandum Opinion and Order - Page 60**

(mootness)." *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). The mootness doctrine "ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit [. . .] including the pendency of the appeal." *McCorvey v. Hill,* 385 F.3d 846, 848 (5th Cir. 2004), *cert. denied*, 543 U.S. 1154 (2005).

Although the parties do not address mootness in their proposed conclusions of law, the court raises it *sua sponte* and will address it after analyzing standing.  As stated by the Fifth Circuit, "[m]ootness goes to the heart of our jurisdiction under Article III of the Constitution. Therefore, we must consider mootness even if the parties do not raise it, because 'resolution of this question is essential if federal courts are to function within their constitutional spheres of authority.'" *Texas Office of Pub. Util. Counsel v. F.C.C.,* 183 F.3d 393, 413 n.16 (5th  Cir.1999) (quoting *North Carolina v. Rice,* 404 U.S. 244, 245 (1971)).

### 1.     Standing

Defendants apparently acknowledge that Plaintiff Ms. Santamaria, on behalf of her children Does #1, #2 and #3, has standing to bring claims against them for Fourteenth Amendment and Title VI violations.[35]  In their Proposed Conclusions of Law, however, Defendants contend that OFE lacks standing to sue Defendants.  *See* Defendants' Proposed Conclusions of Law ¶¶ 428, 432.

A party has direct standing if: (1) he has suffered a "concrete and particularized" injury that is actual or imminent rather than conjectural or hypothetical; (2) there is a causal relationship between the injury and the challenged conduct; and (3) it is likely and not merely speculative that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Westfall v. Miller*, 77 F.3d 868, 871 (5th Cir. 1996).  Associational standing is also

---

[35]Specifically, in Defendants' Proposed Conclusions of Law, Defendants do not challenge Ms. Santamaria's standing to bring this lawsuit on behalf of her Latino children, Does #1, #2 and #3.

a three-part test, namely that: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members. *See Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006).  Though an association may have standing to seek "a declaration, injunction, or some other form of prospective relief" on behalf of its members, it does not enjoy standing to seek damages for monetary injuries peculiar to individual members where the fact and extent of injury will require individualized proof.  *Warth v. Seldin*, 422 U.S. 490, 515-16 (1975); *see also Friends for American Free Enterprise Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002) (where association of manufacturer's representatives brought suit against retailer for tortious interference with contractual relations after retailer adopted policy of no longer selling goods through representatives, because multiple specific contracts between individual representatives and manufacturers required individualized information about the contracts, individual members required to participate and association had no standing).

For the reasons set forth directly below, the court concludes that OFE has standing to bring a section 1983 claim for injunctive relief against Defendants for alleged violations of the Fourteenth Amendment.  First, the association's members would independently meet the Article III standing requirements, in addition to the requirements for associational standing set forth in *Benkiser*, *supra*. Ms. Gonzalez and Ms. Santamaria both testified they were members of OFE, and that OFE was an organization comprised of approximately fifty (50) members who were concerned parents of Latino students enrolled at Preston Hollow seeking relief from Defendants' allegedly unlawful practices. Ms. Gonzalez and Ms. Santamaria both testified that the mission of OFE is to ensure

nondiscrimination of Latinos at Preston Hollow.  OFE members Ms. Gonzalez's and Ms. Santamaria's children were allegedly segregated, along with other minority children, into Preston Hollow's ESL classes, away and apart from Anglo students.  As Plaintiffs correctly argue, there is injury in fact to the OFE because the members testified that the mission of OFE is to ensure nondiscrimination of Latinos at Preston Hollow and OFE's mission was adversely affected by, the unlawful practices of Defendants.  As to causal relationship between the conduct and the alleged injury, Defendants have the responsibility to provide Latino students an equal educational opportunity, but through the alleged unlawful practices of segregation in this case, they have failed to fulfill this responsibility to the detriment of Latino students. The injunctive relief Plaintiffs are seeking, if granted, would redress the alleged injuries to Latino children, as Defendants would be prohibited from segregating students at Preston Hollow based on race, ethnicity or national origin.

Second, the interests OFE seeks to protect are germane to the purpose of the organization. Ms. Gonzalez and Ms. Santamaria testified that one of the purposes of OFE was to end discrimination and segregation at Preston Hollow.  The court concludes that the organization is seeking to protect interests that are germane to its purpose.

Third, insofar as OFE is seeking injunctive relief, neither the claim asserted nor the relief requested requires participation of individual members.[36]  The type of relief sought, injunctive, will inure to the benefit of the members of OFE, given their common goal.  The interests of OFE's members appear to be fully protected by Ms. Santamaria's claims.  In short, having considered the

---

[36]The court concludes, however, that OFE does not have standing to bring a claim against Defendants for monetary damages, as damages for monetary injuries, if any, are peculiar to the individual members of the association and the facts and extent of injury, if any, will require individualized proof.  *Warth*, 422 U.S. at 515-16.  Moreover, in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Plaintiffs appear to be limiting OFE's request to injunctive relief.

evidence and applicable law, the court determines that OFE has standing to bring this action seeking injunctive relief against Defendants under 42 U.S.C. § 1983 challenging the constitutionality of the student assignment practices at Preston Hollow.[37]

### 2.    Mootness

A case is moot where the cause of action is no longer live, or where the parties no longer hold a personal stake in the outcome.  *Henschen v. City of Houston*, 959 F.2d 584, 587 (5th Cir. 1992).  Plaintiffs seek both injunctive relief and compensatory damages.  "Justiciability must be analyzed separately on the issues of money damages and the propriety of injunctive relief."  *Id.*; *see also  Pederson v. Louisiana State Univ.*, 213 F.3d 858, 874 (5th Cir.  2000) (same).

### a.    Injunctive Relief

Given that the 2005-2006 academic year has been completed, and Doe #1 and Doe # 2 have since graduated from Preston Hollow, Ms. Santamaria's claims for injunctive relief on behalf of Doe #1 and Doe #2 are moot.  Otherwise stated, Doe #1's and Doe #2's past exposure to alleged illegal conduct does not present a case or controversy regarding injunctive relief.  *See generally Pederson*, 213 F.3d at 877 (where female students complaining of Title IX violations had graduated, request for injunctive relief mooted); *Sapp v.Renfroe*, 511 F.2d 172, 175 (5th Cir. 1975) (claim for injunctive relief  mooted  by  graduation  of  student  challenging  constitutionality  of  board  of  education requirement that students complete ROTC prior to graduation).  In short, as Doe #1 and Doe #2

---

[37]For reasons set forth later in this opinion, the court need not reach the issue of whether OFE has standing to bring a Title VI claim against Defendants.

**Memorandum Opinion and Order - Page 64**

cannot possibly benefit from a favorable ruling on the question implicating injunctive relief, the request for injunctive relief is moot as to them.[38]

During the trial, Ms. Santamaria testified that Doe #3 is enrolled at Preston Hollow for the 2006-2007 academic year.  Accordingly, Doe #3's claim for injunctive relief is not moot.

### b.     Monetary Relief

Ms. Santamaria's claim for money damages on behalf of Does #1, #2 and #3 is not moot. If Defendants' conduct violated their rights, and if that conduct caused actual damages, Ms. Santamaria, on behalf of Does 1, #2 and #3, has stated a live claim under 42 U.S.C. § 1983. *Henschen*, 959 F.2d at 587; *Sapp*, 511 F.2d at 176 (graduation of student who challenged constitutionality of school board action does not moot claim for money damages); *Pederson*, 213 F.3d at 875 (graduation of female students complaining of Title IX violations does not moot claim for monetary relief based on past harm).  Such damages, of course, must compensate for actual harm, "not just the intangible value of a constitutional right."  *Henschen*, 959 F.2d at 587 (citation omitted).     **B.     Fourteenth Amendment Violations brought pursuant to 42 U.S.C. § 1983**

### 1.     Legal Standard

The Fourteenth Amendment to the United States Constitution provides in pertinent part:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due

---

[38]One possible exception to the mootness of injunctive relief in this case pertains to conduct that is capable of repetition, yet evading review.  *See generally Moore v. Ogilvie*, 394 U.S. 814, 816 (1969).  This exception requires satisfaction of two components: "the duration of the challenged action must be too short to enable the parties to litigate fully, and there must be a reasonable expectation that the same party will again be subject to the same action." *Henschen*, 959 F.2d at 589 (citation omitted).  Here, the situation is not capable of repetition as to Doe #1 and Doe #2. *See generally DeFunis v. Odegaard*, 416 U.S. 312 (1974) (rejecting law student's attempt to evade mootness of his claim challenging school's admission policy under the "capable of repetition yet evading review" doctrine, since the admission policy was not capable of repetition as to him).

> process of law; nor deny to any person within its jurisdiction the
> equal protection of the laws.

U.S. Const. amend. XIV, § 1.

The court's analysis of student classroom assignments at Preston Hollow begins with the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954) (*Brown I*), where the Court declared that public school systems segregated by race are unconstitutional, because they deny minority students equal protection of the laws under the Fourteenth Amendment. As the Court stated, "[s]eparate educational facilities are inherently unequal." *Id.* at 495.[39] It is equally well-established that "classrooms that are segregated by race are proscribed regardless of the degree of overall schoolwide segregation achieved." *McNeal v. Tate County Sch. Dist.*, 508 F.2d 1017, 1019 (5th Cir. 1975) (citing *Adams v. Rankin County Board of Educ.*, 485 F.2d 324 (5th Cir. 1973)). Latinos "constitute an identifiable class for purposes of the Fourteenth Amendment." *Keyes v. School Dist. No. 1, Denver, Colorado*, 413 U.S. 189, 197 (1973).

Plaintiffs' section 1983 claim based on the Equal Protection Clause of the Fourteenth Amendment requires proof of racially discriminatory intent or purpose. *See Washington v. Davis*, 426 U.S. 229, 242 (1976); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). "Because direct evidence of discriminatory purpose is rarely available, courts must make 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Jim Sowell Constr. Co. v. City of Coppell, Tex.*, 61 F.Supp.2d 542, 546 (N.D.Tex.1999) (Fitzwater, J.) (quoting *Arlington Heights*, 429 U.S. at 266)); *see also LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 449 (5th Cir. 1996); *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir.

---

[39]In *Brown v. Board. of Educ.*, 349 U.S. 294, 301 (1955) (*Brown II*), the Court directed defendant school systems and district courts to devise and implement remedial racially nondiscriminatory systems with "all deliberate speed."

1994). "The court must therefore look at the totality of the relevant evidence to determine whether invidious discriminatory purpose was a motivating factor for the decision." *Id.* (citing *Washington*, 426 U.S. at 242). The Court in *Arlington Heights* set forth numerous factors a court may consider in its inquiry into whether discriminatory purpose was a factor:

> The impact of the official action whether it "bears more heavily on one race than another," may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.
>
> * * *
>
> The historical background of the decision is [another] evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . . The specific sequence of events leading up to the challenged decision may also shed some light on the decisionmaker's purposes. . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

*Id.* at 266-67 (citations omitted).

### 2. Analysis

#### a. Direct Evidence of Intentional Discrimination

Plaintiffs presented direct evidence that Principal Parker intended to segregate Latino students from their Anglo counterparts by reserving General Education classes for Anglo students and concomitantly assigning non-LEP Latino and African-American students to ESL-designated classes, even though their language learning needs were the same as those of the Anglo students. Ms. Leon and Ms. Walsh both testified based on first-hand knowledge that Principal Parker's

intended purpose was to maintain and reserve certain classrooms at Preston Hollow for Anglo "neighborhood" students.

Ms. Walsh testified that the white neighborhood kids were placed together in neighborhood classes because "the parents want them to be together." Tr. Vol. IV-A, at 28-29. Ms. Walsh also provided testimony that when she was in the office checking her mailbox she overheard Principal Parker guarantee a prospective Anglo parent that her child would be in the same class as another Anglo child, as there were mixed-age classes and neighborhood kindergarten classes. Ms. Walsh also testified that as early as June 2005, Principal Parker had already determined that the seventeen (17) incoming "neighborhood students" would be placed in Ms. Prudhomme's General Education class (KC-Gen.) and if more neighborhood students enrolled than anticipated at that time, another teacher would be brought in to team-teach with Ms. Prudhomme. This evidence makes it clear to the court that Principal Parker did not consider it a viable option to assign the non-LEP Anglo incoming Kindergarten students to a predominantly minority Kindergarten classroom, even though non-LEP Latinos and African-Americans were assigned to that classroom.

When asked why the neighborhood classes contained predominantly Anglo children and her 4A-ESL had no Anglo children, Ms. Leon testified that it was done "to have all the neighborhood children grouped together," and further testified that "the people who live in the Preston Hollow neighborhood, who are the majority being white, would want their children grouped together." Tr. Vol. II, at 160.

Ms. Gonzalez and Ms. Santamaria both testified that Principal Parker told them their Latino children were in ESL-designated classes because of their national origin. Specifically, when asked on direct examination what occurred at a January 2006 meeting, Ms. Gonzalez testified that when

she inquired about her daughter's classroom assignment, Principal Parker told her that "the children were assigned to [LEP] classes according to their origin and from what country they came from." Tr. Vol. I-A, at 116.  When asked what she understood from Principal Parker's statement, Ms. Gonzalez testified that "[i]t [was] very obvious to me that that's how my daughter was placed in LEP, because she didn't qualify for that, but she was placed there because of her origin and the country she had come from."  *Id.*  Ms. Santamaria testified similarly that at the meeting she was told that ESL "classes were assigned to children that came from other countries."  Tr. Vol. VI-A, at 138. Although Principal Parker testified that she never made this statement, in light of the court's finding that Principal Parker's testimony was not always credible, *see supra*, the court believes Ms. Santamaria's and Ms. Gonzalez's testimony.  In short, Principal Parker's own statements to Ms. Santamaria and Ms. Gonzalez are direct evidence of discrimination based on national origin.

Finally, the evidence shows that Principal Parker overrode Ms. Binfield's proposed Sixth Grade roster for the 2005-2006 academic year in which the Anglo students were assigned proportionately, and instead directed that all the Anglo children were to be in one classroom together.  Even though the court has direct evidence of intentional discrimination, or at a minimum compelling circumstantial evidence of intentional discrimination, by Principal Parker, the court will also consider and discuss evidence from which an inference of discriminatory purpose can reasonably be drawn.

#### b.   Other Facts Evidencing Intentional Discrimination

##### 1.   "A Clear Pattern of Segregation, Unexplainable on Grounds Other than Race" or National Origin

As stated by the Supreme Court in *Arlington Heights*:

> The impact of the official action whether it "bears more heavily on one race than another," may provide an important starting point. *Sometimes a clear pattern, unexplainable on grounds other than race*, emerges from the effect of the state action even when the governing legislation appears neutral on its face.

*Arlington Heights*, 429 U.S. at 266-67 (emphasis added).  Such is the case before the court.

Given the ethnic breakdown in classroom assignments set forth in great detail in the court's Findings of Fact, including without limitation Plaintiffs' Exhibit 117 prepared by Defendant Principal Parker and Plaintiffs' Exhibit 277 prepared by Dr. Evans, along with the testimony of Ms. Walsh, Ms. Leon, Ms. Schill and Assistant Principal McElroy, the court has no trouble concluding that certain classrooms at Preston Hollow are unjustifiably disproportionately Anglo (in relation to their overall percentage of the population at the school), and that certain classes are entirely made up of Latinos and African-Americans, or disproportionately made up of Latinos and African-Americans.  The court also has no trouble concluding that the hallways are racially identifiable, that is, predominantly minority classrooms are clustered in different hallways, away from the predominantly Anglo classrooms.  *See* Pl. Ex. 3.  The evidence and testimony also show conclusively that the predominantly minority ESL-designated classes (and the Bilingual classes for that matter) do not integrate with the predominantly Anglo general education classes for core curriculum, and only very rarely integrate for non-core curriculum, also known as specials.  *See* Pl. Ex. 112.  The integration permitted in the non-core curriculum is generally limited to physical education.  The court concludes that this system of classroom assignments "bears more heavily on

one race than another[,]" *Arlington Heights*, 429 U.S. at 266, as non-LEP Latinos and African-Americans are assigned to ESL-classes rather than being given the opportunity to be instructed in General Education classes.[40]

Assistant Principal McElroy testified that he believed that white neighborhood students were being purposefully kept together.  Specifically, his trial testimony was as follows:

> Q.      Did you ever have the impression or did you ever conclude, based on what you had seen, that there was someone out there purposely trying to keep these white neighborhood students together?
>
> A.      Yes.  I would like to note that over the years I have made – I have had several impressions.  One of those impressions being exactly what you stated.

Tr. Vol. III-A, at 35.  Given his testimony that Principal Parker was responsible for all classroom assignments at Preston Hollow, the court reasonably draws the inference that the "someone" referred to would be the individual who had the power to make class assignment decision, namely, Principal Parker.  Assistant Principal McElroy further testified that, in his opinion, minority students who indicated "English English" on their HLS were placed in ESL classes only because of their race.  He testified that even though Anglos were not a majority in 6C-Gen., every Anglo Sixth Grader was in that class (until the Sixth Grade teachers, on their own, shuffled the classroom assignments to be more integrated toward the end of the 2005-2006 school year).

Ms. Schill, Ms. Walsh and Ms. Leon all testified that, based on their numerous years of experience as educators, they could think of no "sound pedagogical reason" why non-LEP minority

---

[40]In addition to being segregated from Anglos, based on the testimony of the Preston Hollow teachers, the court determines that ESL classes generally have a slower pace than General Education classes and less opportunity for enrichment.

students were taught in separate classes than non-LEP Anglo students, as their learning needs were the same.  They also testified that there was no reason why an ESL-certified teacher could not instruct Anglo non-LEP students in an ESL-designated class.  Based on his numerous years as an educator, Assistant Principal McElroy testified that he could think of no sound educational reason for Latino non-LEP and white non-LEP students to be divided into different classrooms as they were in all of the grades at Preston Hollow, since there was no difference in their language learning needs.

Finally, Dr. Evans, DISD's Assistant Superintendent for the Multi-Language Enrichment Program, questioned the pedagogical rationale for the predominantly Anglo mixed-age classes.  She testified that she suspected a "screening mechanism" for entry in the mixed-age classes, such as tests, a DISD policy, or perhaps recommendations from prior teachers, but found none of these.  Tr. Vol. V-A, at 12-13.  With regard to First and Second grade, she testified that in the 1A-ESL class, fourteen (14) of the nineteen (19) students were Latino compared to only four (4) Latino students in MA2-Gen.  In her report of campus findings, she stated:

> There are too many classes per grade level designated as ESL for the number of students who need ESL instruction.  For example, in grade K, there are 6 ESL students and 3 ESL teachers. . . . There are three multi-grade classrooms of grades 1 and 2, as well as two multi-grade classrooms for grades 3 and 4.  There is a large number of white students in each class, ranging from 8 to 18, in these classes.  By contrast, there are small groups of non-ELL Hispanic students in these classes, ranging from 2 to 6.

Pl. Ex. 277.  With regard to her campus findings, Dr. Evans expressed the following concern: "What is the rationale for the multi-grade classes?  What criteria are used for placing students in the multi-grade classes?"  *Id.*  She testified she had found no answer to these questions, though she did not inquire of Principal Parker.

From the totality of this evidence showing a clear pattern of segregation, inexplicable on grounds other than race and national origin, the court determines that student classroom assignments were the result of intentional discrimination based on race or national origin.   Accordingly, such classroom assignments constitute illegal segregation that denies Latino children equal protection of the laws and violates the Fourteenth Amendment.

### 2.        Historical Background and Sequence of Events

The Court in *Arlington Heights* also stated:

> The historical background of the decision is [another] evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes[. . . . ] The specific sequence of events leading up to the challenged decision may also shed some light on the decisionmaker's purposes[. . . .]

*Arlington Heights*, 429 U.S. at 266-67.   The evidence shows that Principal Parker's system of classroom assignments and class rotation schedules at Preston Hollow is not isolated to the 2005-2006 academic year.   The evidence admitted at trial, including confidential student files placed under seal by court order, shows that since Principal Parker began as Principal in 2001 (and even before her tenure), non-LEP Latinos have been disproportionately placed in ESL-designated classes while their Anglo counterparts have been disproportionately placed in General Education classes, even though they have the same language learning needs.   Assistant Principal McElroy testified that most of the teachers had raised concerns to him in the past about the manner in which students were being placed in their classes at Preston Hollow.   He further testified that during prior years he had also raised his concerns to Principal Parker regarding "race and ethnicity in the classrooms."   Tr. Vol. III-A, at 40.   Ms. Walsh testified that over the years she had raised her concerns regarding the ethnic composition of classes at Preston Hollow to various area superintendents.

### 3.    Substantive and Procedural Departures

In analyzing what types of evidence may lead a court to determine a discriminatory purpose, the Court in *Arlington Heights* also stated:

> Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

*Arlington Heights*, 429 U.S. at 266-67 (citations omitted). The evidence and trial testimony by Dr. Evans and others demonstrate that assignment of non-LEP students to ESL-designated classes and retention of students in ESL classes even after they exit LEP status is a deviation from the normal procedure contemplated in the District. *See generally* Def. Ex. 30 (MLEP Guide); Def. Ex. 31 (LPAC Handbook).

The DISD's Multi-Language Enrichment Program PK-5 Guide ("MLEP Guide") provides:

> Bilingual education and English as a second language (ESL) shall be taught to enable [LEP] students to become competent in the comprehension, speaking, reading and composition of the English Language. Programs shall emphasize mastery of English language skills as well as mathematics, science, and social studies, as integral parts of the academic goals for all students to enable LEP students to participate equitably in school. Bilingual education and ESL programs shall be integral parts of the total school program. These programs shall use instructional approaches designed to meet the special needs of LEP students[,] and the basic curriculum content of the program shall be based on the [required] state essential knowledge and skills.

Def. Ex. 30 at 17-18. The MLEP Guide does not even countenance that non-LEP students would have a need to be assigned to ESL-designated classrooms. *See id.* The LPAC Handbook provides that when a student meets the exit criteria to become non-LEP, "the identified student is to be

recommended for enrollment into the general education classroom with no second language acquisition modifications." Def. Ex. 31 at 164.

At Preston Hollow, Principal Parker regularly deviated from these procedures with regard to non-LEP students who were Latino or African-American. An example is Doe #1, who was exited from LEP status on September 13, 2005, yet remained in 5A-ESL the entire 2005-2006 academic year. The evidence shows that exited-LEP students were regularly retained in ESL-designated classrooms. Another example is Doe #3. Although she received a "4" on her Woodcock Muñoz in First Grade (and thus was non-LEP), she was labeled as LEP and placed in Bilingual classes for First and Second Grade and an ESL class for Third Grade. Dr. Evans questioned the placement decisions of Doe #1 and Doe #3. In short, factors normally considered important in deciding whether to place a student in an ESL-designated class (that is, whether he or she was LEP), would lead to classroom assignments different than those made in this case by Principal Parker. Factors normally considered important in exiting a student from LEP-status, and "recommend[ing] [the student] for enrollment into the general education classroom with no second language acquisition modifications[,]" (Def. Ex. 31 at 164), would also lead to classroom assignments of exited-LEP students different than those made by Principal Parker in this case.

Additionally, the State of Texas requires that LEP students "participate with their English-speaking peers in regular classes provided in the subjects" and "have a meaningful opportunity to participate with other students in all extracurricular activities." Tex. Admin. Code § 89.1210(g). The evidence before the court clearly shows that this is not the case at Preston Hollow. Instead, the evidence shows that students in ESL-designated classes and Bilingual Classes did not integrate with students in General Education classes for core curriculum, and only rarely did so for specials.

The teachers also testified that over the years, when they taught mixed-age classes, prospective parents would be brought by on tours, but when they taught ESL-designated classes, prospective parents would not be brought to visit the predominantly minority classes.  Principal Parker had the authority to approve all visitors entering the school and touring the classrooms.

The sequence of events following the initiation of this lawsuit shows substantive and procedural departures which serve as further evidence that improper purposes played a role in, among other things, student classroom assignments at Preston Hollow.  The evidence shows that Principal Parker took actions late in 2005-2006 that modified the school's traditional practices related to student classroom assignments and graduation ceremonies.  In anticipation of Ms. Guzman's visit to observe the classes, Principal Parker directed the students in certain racially identifiable classrooms to be moved temporarily to other classrooms, with the effect that classrooms would temporarily appear more racially diverse to the observer.  Principal Parker also changed the manner in which Preston Hollow traditionally conducted its graduation award ceremonies so that an observer could not determine which students were in which class.  Also, Principal Parker required CILT members to sign a confidentiality agreement preventing them from discussing the manner in which students are placed.  Principal Parker also planned the first ever "Shadow Day" at Preston Hollow to coincide with Ms. Guzman's visit.  On that day, children would spend the day visiting the grade-level they would be in the following year.  Again, this would skew the ethnic composition of classrooms during the observer's visit.  Finally, Principal Parker announced that during the 2006-2007 academic year, Preston Hollow would no longer have mixed-age classes.  Although Assistant Principal McElroy exhorted her to end the mixed-age classes during the 2005-2006 school year, she did not.

**Memorandum Opinion and Order - Page 76**

Preston Hollow also deviated from normal procedure with regard to "open houses."  Ms. Walsh testified that the mixed-age classes had their own "open house" during the first week of school at Preston Hollow, separate from the open house and hot dog supper for the entire school held in September.  Ms. Walsh testified that the PTA and Principal Parker coordinate school open houses. In addition to a separate open house, Ms. Walsh testified about a separate "kindergarten round-up" for the neighborhood parents, the purpose of which was to attract more neighborhood parents to send their children to Preston Hollow.  A round-up is for pre-Kindergarten and Kindergarten students to register for the following year.  She testified that the postcard invitation for the special Kindergarten round-up was not distributed to teachers to put in the Tuesday folders (which is the normal procedure), but instead was handed out in the carpool line, where neighborhood parents generally pick up their children after school.  The invitation provided the name and address of the school, and the school phone number, and also stated that Principal Parker would be present at the round-up.

### 3.    Defendants' "Separate But Equal" Argument

The court now addresses Defendants' contention that no constitutional violation is taking place, since non-LEP minority students in ESL classes are receiving an equal educational opportunity as non-LEP Anglo students in General Education classrooms, because all classes at Preston Hollow follow DISD's mandated curriculum, and the same scope and sequence.  The court is baffled that in this day and age, Defendants are relying on what is, essentially, a "separate but equal" argument.  The court cannot help but be reminded of the Supreme Court's decision over one hundred and ten years ago in *Plessy v. Ferguson*, 163 U.S. 537 (1896).  Homer Adolph Plessy, a man of mixed race,[41] was criminally prosecuted for his failure to leave a whites-only railway

---

[41]Plessy was actually 7/8 white.

passenger car. *Id.* at 538. Louisiana law at the time required railroad companies to provide "equal but separate accommodations for the white and colored races." The Supreme Court rejected the argument that the "enforced separation of the two races stamps the colored race with a badge of inferiority" (*id.* at 551) and held that "separate but equal" accommodations do not violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 550-52. The court thought this issue had been buried when the Supreme Court declared "separate educational facilities are inherently unequal." *Brown I*, 347 U.S. at 495. The court is also reminded of *Sweatt v. Painter*, 339 U.S. 629, 633 (1950). In *Sweatt*, an African-American man was denied admission to The University of Texas School of Law since, under Texas law at the time, "[s]eparate schools shall be provided for the white and colored children, and impartial provision shall be made for both." Tex. Const. art. VII,§ 7 (repealed 1969). The Texas court held that Texas State University for Negroes offered Sweatt the "privileges, advantages, and opportunities for the study of law substantially equivalent to those offered by the State to white students at The University of Texas." *Sweatt v. Painter*, 210 S.W.2d 442, 445 (Tex. Civ. App. [Austin] 1948, writ ref'd). The Supreme Court reversed, holding that the legal education offered Mr. Sweatt at Texas State University for Negroes was not substantially equal to that which he would receive if admitted to The University of Texas School of Law, and that the Equal Protection Clause of the Fourteenth Amendment required that he be admitted to The University of Texas School of Law. *Sweatt v. Painter*, 339 U.S. 629 (1950).

A unanimous Court focused on factors of segregated education that could not be measured by objective criteria, stating:

> What is more important, the University of Texas Law School possesses to a far greater degree those qualities which are incapable of objective measurement but which make for greatness in a law school. Such qualities, to name but a few, include reputation of the

> faculty, experience of the alumni, standing in the community, tradition and prestige. It is difficult to believe that one who had a free choice between these law schools would consider the question close.

*Id.* at 634.  Similarly, in this case it is difficult to believe that a non-LEP student in the ESL class who had a free choice between the ESL classroom and the General Education classroom would choose the ESL classroom.

### 4.   Conclusion

The court has pored over the evidence and law, and considered all possible bases presented by Principal Parker for student assignments at Preston Hollow, hoping to not find intentional discrimination.  None of the reasons advanced by Principal Parker holds up under the court's scrutiny.  Direct and circumstantial evidence establish that Principal Parker, primarily by way of classroom assignments and class rotation schedules, unlawfully segregated Does #1 and #3 at Preston Hollow based on race and national origin.  Reading between the lines, along with observing the witnesses, and taking into account all that transpired at trial, the court is left with the distinct impression that the primary objective of fairly educating students was lost and substituted in its place was an effort to prevent white flight from Preston Hollow.  In reserving certain classrooms for Anglo students, Principal Parker was, in effect, operating, at taxpayer's expense, a private school for Anglo children within a public school that was predominantly minority. In light of the evidence and applicable law, the court determines that Principal Parker denied Does #1 and #3 equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution. Accordingly, she is liable to Does #1 and #3 for such violations, and they are entitled to monetary damages.

## C.   Title 42 U.S.C. § 1983[42]

### 1.   Legal Standard

Title 42 U.S.C. § 1983 provides a civil remedy in federal court for violations, under color of state law, of the rights, privileges and immunities secured by the Constitution and laws of the United States. *Findeisen v. N.E. Indep. Sch. Dist.*, 749 F.2d 234, 236-37 (5th Cir. 1984), *cert. denied*, 471 U.S. 1125 (1985).   Section 1983 extends protection to all rights guaranteed by the Fourteenth Amendment. *Id.* at 237.   It is well-established that school administrators, such as principals, are state actors for purposes of section 1983. *See, e.g., Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521 (5th Cir. 1994) (DISD school principal treated as state actor by court).

A governmental entity, such as the DISD, can be sued and subjected to monetary damages and injunctive relief under 42 U.S.C. § 1983 only if its official policy or custom causes a person to be deprived of a federally protected right. *Board of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A governmental entity *cannot* be liable for civil rights violations under a theory of respondeat superior or vicarious liability. *Id. See also Baskin v. Parker*, 602 F.2d 1205, 1208 (5th Cir. 1979). Likewise, supervisory officials may not be held vicariously liable under § 1983 for the actions of their subordinates. *Leffall*, 28 F.3d at 525.

---

[42]Section 1983 provides in part as follows:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

Official policy is defined as :

1.     A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [school district]  lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2.     A persistent, widespread practice of [school district] officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents [school district]  policy.  Actual or constructive knowledge of such custom must be attributable to the governing body of the [school district] or to an official to whom that body had delegated policy-making authority.

*Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1305 (5th Cir. 1995), *cert. denied*, 517 U.S. 1191 (1996); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (*en banc*) (per curiam); *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (*en banc*) (per curiam), *cert. denied*, 472 U.S. 1016 (1985).  A plaintiff must identify the policy, connect the policy to the governmental entity itself and show that his injury was incurred because of the application of that specific policy. *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984), *cert. denied*, 472 U.S. 1016 (1985).  A plaintiff must establish that the governmental entity through its deliberate conduct was the "moving force behind the injury alleged" and must establish a direct causal link between the governmental entity's action and the deprivation of a federally protected right.  *Bryan County,* 520 U.S. at 404.

Liability must rest on official policy, meaning the governmental entity's policy, and not the policy of an individual official.  *Bennett*, 728 F.2d at 769.  The official complained of must possess

[f]inal authority to establish [school district] policy with respect to the action ordered. . . .The official must also be responsible for establishing final government policy respecting such activity before the [school district] can be held liable. . . . [W]hether an official had final policymaking authority is a question of state law.

**Memorandum Opinion and Order - Page 81**

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-82 (1986).   Under Texas law, the final policymaking authority in an independent school district rests with the district's trustees.  *Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1245 (5th Cir. 1993).[43]  An employee, agency, or board of a governmental entity is not a policymaker unless the governmental entity, through its lawmakers, has delegated exclusive policymaking authority to that employee agency or board and *cannot* review the action or decision of the employee, agency or board.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Worsham v. City of Pasadena*, 881 F.2d 1336, 1340-41 (5th Cir. 1989).

The policy or custom relied upon to establish liability may include the inaction of official policymakers, but only when such inaction constitutes "deliberate indifference" to the rights of the plaintiff, and such indifference is a "closely related" cause of the plaintiff's injuries. *City of Canton v. Harris,* 489 U.S. 378, 388, 391 (1989).  The failure or inaction "must amount to an intentional choice, not merely an unintentionally negligent oversight."  *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992) (citing *Canton*, 498 U.S. at 390).   The *City of Canton* "deliberate indifference" standard applies to section 1983 lawsuits against a school official in a supervisory role who failed to prevent constitutional violations by a subordinate.  *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir.) (*en banc*), *cert. denied sub nom. Lankford v. Doe*, 513 U.S. 815 (1994) ("Liability arises only at the point when the student shows that the official, by action or inaction, demonstrates a deliberate indifference to his or her constitutional rights.").   As noted by the court in that case: "The terms 'gross negligence' and 'deliberate indifference' are sometimes confused and

---

[43]Texas Education Code § 11.051 provides that, "An independent school district is governed by a board of trustees who as a body corporate, shall oversee the management of the district."  The Education Code further provides that "[t]he trustees as a body corporate have the exclusive power and duty to govern the public schools in the district" and that "[t]he trustees may adopt such rules and bylaws necessary to carry out the[ir] powers and duties." *Id.* § 11.151(b).  Nothing in the Texas Education Code purports to give the Superintendent any policymaking authority or the power to make rules or regulations.

interchanged; however, 'deliberate indifference' is a stricter standard." *Id.* at 453 n.7 (citation omitted). "'Gross negligence' is a heightened degree of negligence, whereas 'deliberate indifference' is a 'lesser form of intent.'" *Id.*

> ## 2.      Analysis

Plaintiffs have sued the Board of Trustees, DISD, Superintendent Hinojosa (in his official capacity) and Principal Parker (in her official and individual capacities) pursuant to 42 U.S.C. § 1983. Plaintiffs' section 1983 suit against Superintendent Hinojosa and Principal Parker in their respective official capacities is treated as one against DISD, the governmental entity of which they are an employee, representative, or official. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Brooks v. George County*, 84 F.3d 157, 165 (5th Cir.), *cert. denied*, 519 U.S. 948 (1996).

> ### a.      DISD, Board of Trustees, and Superintendent Hinojosa and Principal Parker in their Respective Official Capacities

Plaintiffs contend that they suffered a deprivation of their right to equal protection under the Fourteenth Amendment and are suing DISD and the Board of Trustees under 42 U.S.C. § 1983. Plaintiffs claim DISD and the Board of Trustees are liable under section 1983 because of a custom of DISD to segregate Anglo students from Latino students and because the decision to segregate students was made by Principal Parker, to whom the Board of Trustees had delegated "final policymaking authority" with regard to student placement at Preston Hollow. Plaintiffs also contend they are entitled to relief under section 1983 against DISD and Board of Trustees because DISD failed to train Principal Parker with respect to appropriate student classroom assignments.

Plaintiffs also contend that Superintendent Hinojosa (sued only in his official capacity), who had actual knowledge of the student classroom assignments at Preston Hollow, is liable under section 1983 for failure to adequately train, supervise and discipline Principal Parker, and that such

failure evidences a deliberate indifference to the constitutional rights of Latino students who were affected by the lack of training and supervision.

With respect to DISD policy, the only evidence relating to equal protection under the laws at schools is that DISD voluntarily maintains a nondiscrimination policy.  Additionally, Plaintiffs have presented no evidence that the DISD Board of Trustees had actual or constructive knowledge of any alleged custom or practice of unlawful segregation at Preston Hollow.[44]  Although Ms. Walsh testified that she had raised concerns regarding the ethnic composition of classes at Preston Hollow to various area superintendents over the years, there is no evidence that the Board of Trustees had actual or constructive knowledge about these complaints through the area superintendents or otherwise.  Moreover, Plaintiffs' argument and the evidence presented showing that Superintendent Hinojosa had actual knowledge of the unlawful custom or practice would only be meaningful if Plaintiffs had presented evidence that DISD Board of Trustees delegated policymaking authority to him, which is not the case.

Furthermore, the court rejects Plaintiffs' argument that the Board of Trustees delegated to Principal Parker "final policymaking authority" with regard to student classroom assignments at Preston Hollow.  Plaintiffs point to Plaintiffs' Exhibit 283, Board Policy EEA (Local), which gives a school principal responsibility for grouping students at schools.   That Principal Parker may have been delegated the final decision on campus regarding student grouping does not mean that she had policymaking authority, or had been delegated the status of policymaker, much less final policymaker, with respect to student classroom assignments.  In *Pembaur* and *Praprotnik*, the Court

---

[44]In fact, only after Plaintiffs rested did they appear to realize they had failed to present evidence of actual or constructive knowledge by a policymaker.  Plaintiffs then sought to reopen their case-in-chief to attempt to present such evidence.  The court denied this request.

**Memorandum Opinion and Order - Page 84**

carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority. As stated in *Pembaur*:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official-even a policymaking official-has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

475 U.S. at 481 (internal footnotes and citations omitted).  Even were the court to treat Plaintiffs' Exhibit 283 as a delegation of policy-making authority to Principal Parker, Plaintiffs have failed to put forth an iota of evidence that Principal Parker's actions or decisions cannot be reviewed through the chain of command up to the Board of Trustees.  *See generally Praprotnik*, 485 U.S. at 127; *Worsham*, 881 F.2d at 1340-41.  Stated another way, no evidence has been presented that her decisions are not subject to meaningful review.

With regard to Plaintiffs' section 1983 claims against Superintendent Hinojosa in his official capacity, having carefully reviewed the testimony at trial and evidence admitted by the court, the court concludes that it cannot be said that Superintendent Hinojosa was "deliberately indifferent" to the constitutionally protected rights of Latino students at Preston Hollow.  *See City of Canton,* 489 U.S. at 388, 391.  In analyzing Superintendent Hinojosa's actions and inactions, the court keeps in mind that Superintendent Hinojosa was ultimately responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of employees of DISD, which he testified included approximately 240 different campuses.  As he testified: "[I]n a district as large as Dallas, I have to operate through my deputy superintendents, the area superintendents, and the individuals who supervise people who have direct accountability on individual campuses."  Tr. Vol. III-B, at

171.   Absent the ability to delegate responsibilities to his deputy superintendents and area superintendents, a school superintendent's job in such a large district would be next to impossible.

The evidence shows that Ms. Gonzalez approached Superintendent Hinojosa at the conclusion of a PTA meeting in approximately January 2006 and stated in Spanish she had an issue about which she wanted to speak to him.  Superintendent Hinojosa testified that he was busy trying to get to a meeting directly thereafter on the other side of town, and gave Ms. Gonzalez his business card and asked her to call his office.  He testified that he recalled receiving messages from his administrative assistant that Ms. Gonzalez was trying to follow up with him.   He testified that he did not personally return Ms. Gonzalez's call, but that in the normal course, his administrative assistant would return the calls and instruct the individual to "follow [DISD's chain of command[,]" which means that the individual would be referred back to the teacher, followed by the school principal, followed by the area superintendent, followed by Dr. Flores, who would then report to him.  *Id.* at 195-96.

Superintendent Hinojosa further testified that he received a February 9, 2006 letter from Preston Hollow teacher Ms. McKay, informing him that  "classrooms were segregated by race[,]" that "white students were divided into classrooms separate from minority students and the white students were generally receiving a better education."  *See* Pl. Ex. 179.  The letter also provided that the "administration at the school has acknowledged that separate classrooms are created for neighborhood white children.  This segregation is unfortunate and in violation of Title [VI] of the Civil Rights Act of 1964."  *Id.*  Superintendent Hinojosa testified that he forwarded the letter to Dr. Flores, instructing him to check into the matter right away.  Although Superintendent Hinojosa testified that he did not remember exactly what he told Dr. Flores, he testified that he probably said,

"[P]lease look into this matter right away and ensure that everything is being handled appropriately, something to that effect."  Tr. Vol. III-B, at 198.  Dr. Flores thereafter reported to Superintendent Hinojosa that Rene Martinez, DISD's Parent Engagement Executive Director, was taking care of the allegations of segregation in Ms. McKay's letter, that Dr. Flores and Mr. Martinez did not believe it to be a serious matter and that it was a parent wanting the principal removed, not an issue in the classrooms.  Superintendent Hinojosa also testified that he instructed Dr. Collier and Dr. Evans "to fix the problem[]" if they saw one.  *Id.* at 216.  He testified that he wanted the matter handled because he thought there might be a quasi-programmatic issue with the Bilingual and ESL students and wanted to be sure the district was delivering appropriate services in compliance with Title VI.  Superintendent Hinojosa testified that he reviewed an e-mail from Mr. Martinez to his administrative assistant at the time, Barbara Hardin, from which he concluded that the matter had been handled.        Rather than showing inaction or failure to act on the part of Superintendent Hinojosa, the evidence shows that he took Plaintiffs' allegations of segregated classroom assignments seriously and asked Dr. Flores to look into the allegations.  He was thereafter assured that there was not a problem.  He also asked Dr. Collier "to look into" any problem related to the programmatic side of Plaintiffs' allegations and to "fix it" if problems were found.   That Superintendent Hinojosa could have done more, or could have done things differently, is not the test for liability of a school district under section 1983.  His failure or inaction "must amount to an intentional choice, not merely an unintentionally negligent oversight."  *Rhyne*, 973 F.2d at 392.

Additionally, the court concludes that Superintendent Hinojosa's failure to order training on student classroom assignments could, at most, be characterized as negligent.[45]  He testified:

---

[45]Negligence, however, cannot be the basis for a Fourteenth Amendment claim.  *See Daniels v. Williams*, 474 U.S. 327, 328 (1986).

> I have 240 principals.  I order very little training for individual
> principals.  We go through very elaborate professional development
> based upon the needs and based on our district goals.  I have not
> directed any one principal [to get] training of all the principals we
> have in the district.  I delegate that responsibility through Dr. Flores
> to the area superintendent who supervises them on a regular basis.

Tr. Vol. III-B, at 211.  Failure to order training of one principal in such a large school district, where his area superintendents did not make the recommendation to the deputy superintendents, so that they, in turn, could recommend that Principal Parker needed training, is a far cry from deliberate indifference on the part of Superintendent Hinojosa.  The proof offered by Plaintiffs is simply too slender a reed to establish "deliberate indifference" on the part of Superintendent Hinojosa to the constitutional rights of Latino students at Preston Hollow.

Although the court has concluded that there is no legal basis for finding Defendants DISD, the Board of Trustees, or Superintendent Hinojosa and Principal Parker in their respective official capacities liable under 42 U.S.C. § 1983 for violating the Fourteenth Amendment,[46] for the record, the court does not believe that classroom segregation of minorities at Preston Hollow occurred in a vacuum.  The court, however, does not have the requisite evidence that DISD trustees had actual or constructive knowledge of the unconstitutional practices at the school, a legal prerequisite to section 1983 liability.  The court is also left with the distinct impression that Superintendent Hinojosa's deputies and area superintendents did not fully inform and apprise him of the gravity of the situation at Preston Hollow.  Absent accurate reporting from his deputies and area superintendents, he, in turn, could not relay the necessary information to the Board of Trustees.  The court does not know why this information was not passed on to Dr. Hinojosa.  In light of the

---

[46]In light of this determination, Defendants' motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) on behalf of these Defendants as to Plaintiffs' section 1983 claims is hereby **denied as moot**, except as otherwise herein determined.

testimony presented at trial, the court is convinced that area superintendents knew of the concerns raised regarding the placement and assignment of students at Preston Hollow.  The court's decision not to impose liability against DISD, or any official in his or her official capacity, is not to be viewed as an approbation with respect to how this issue has been handled.  This is a case where Plaintiffs simply failed to meet the stringent test for imposing governmental liability under section 1983; it is not one where DISD took affirmative steps to ensure that illegal discrimination and segregation did not take place at Preston Hollow.

### b.        Whether Principal Parker is Entitled to Qualified Immunity

Plaintiffs have also sued Principal Parker under section 1983 in her individual capacity. Government officials who perform discretionary functions are entitled to the defense of qualified immunity, which shields them from suit as well as liability for civil damages, if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A defendant official must affirmatively plead the defense of qualified immunity.  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Principal Parker has pleaded the qualified immunity defense.

In resolving the defense of qualified immunity, the court must first decide "whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999) (citing *Siegert v. Gilley*, 500 U.S. 226, 232-33 (1991)); *see also Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir. 1999).  The second prong of the test requires the court to make two separate inquiries: whether the right allegedly violated was clearly established at the time of the event giving rise to the plaintiff's claim, and if so, whether the conduct of the defendant

**Memorandum Opinion and Order - Page 89**

was objectively unreasonable.  *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999).  Accordingly, the analytical framework for resolving issues of qualified immunity may actually require a *three-step* analysis.  *See Kerr*, 171 F.3d at 339; *Evans*, 168 F.3d at 860; *Hare v. City of Corinth,* 135 F.3d 320, 326 (5th Cir. 1998); *Eugene*, 65 F.3d at 1305.

Whether a defendant acted within the scope of her authority performing a discretionary function and whether a reasonable official in her position would have deemed her conduct unconstitutional are not to be considered by the court unless each part of the three-step inquiry has been answered affirmatively on behalf of the plaintiff.  *Kerr*, 171 F.3d at 339.  In other words, only after a plaintiff demonstrates the existence and violation of a clearly established constitutional or statutory right is the defendant required to show that she was performing a discretionary function and that a reasonable official would not have considered her actions to be unconstitutional at the time of the incident in question.  *Id.* at 338.

A right is "clearly established" only when its contours are sufficiently clear that a reasonable public official would have realized or understood that her conduct violated the right in issue, not merely that the conduct was otherwise improper.  *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987); *Foster v. City of Lake Jackson*, 28 F.3d 425, 429 (5th Cir. 1994).  Thus, the right must not only be clearly established in an abstract sense but in a more particularized sense so that it is apparent to the official that her actions [what she is doing] are unlawful in light of pre-existing law. *Anderson*, 483 U.S. at 640; *Stefanoff v. Hays County*, 154 F.3d 523, 525 (5th Cir. 1998); and *Pierce v. Smith*, 117 F.3d 866, 871 (5th Cir. 1997).

In *Anderson*, 483 U.S. at 641, the Supreme Court refined the qualified immunity standard and held that the relevant question is whether a reasonable officer or public official *could have*

*believed* that her conduct was lawful in light of clearly established law and the information possessed by her.  If public officials or officers of "reasonable competence could disagree [on whether an action is legal], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Gibson v. Rich*, 44 F.3d 274, 277 (5th Cir. 1995) (citing *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994)).  Qualified immunity is designed to protect from civil liability "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.  Conversely, an official's conduct is not protected by qualified immunity if, in light of clearly established pre-existing law, it was apparent the conduct, when undertaken, would be a violation of the right at issue. *Foster*, 28 F.3d at 429.  To preclude qualified immunity, it is not necessary for a plaintiff to establish that "the [specific] action in question has previously been held unlawful." *Anderson*, 483 U.S. at 640.  For an official, however, to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Pierce*, 117 F.3d at 882; *Stefanoff*, 154 F.3d at 525.

Undertaking the necessary analysis, the court first determines that Plaintiffs have alleged the violation of a constitutional right, namely, the rights of Latinos under the Fourteenth Amendment to be free from unlawful segregation in public education. *See generally Brown I*, 347 U.S. at 495 ("[s]eparate educational facilities are inherently unequal."); *McNeal*, 508 F.2d at 1019 ("[C]lassrooms that are segregated by race are proscribed regardless of the degree of overall schoolwide segregation achieved."); *Keyes*, 413 U.S. at 197 ("Hispanos [Latinos] constitute an identifiable class for purposes of the Fourteenth Amendment.").

Second, this right was clearly established at the times alleged by Plaintiffs' in their complaint. *Brown I* was decided in 1954. Decades of case law followed. Moreover, DISD was under a federal desegregation order until 2003. *See Tasby v. Moses*, 265 F.Supp.2d 757 (N.D. Tex. 2003). Principal Parker has been employed as Preston Hollow's Principal since 2001, and thus has operated under the desegregation order. In short, it is beyond cavil that the rights of Latinos to be free from intentional segregation in public schools was well-established by the United States Supreme Court long before the events giving rise to Plaintiffs' allegations. Defendant Principal Parker does not make any argument to the contrary.

As the third step in its § 1983 analysis, the court must determine whether the evidence presented at trial shows that Principal Parker's conduct was objectively unreasonable. Otherwise stated, the court must determine whether a reasonable school administrator, in Principal Parker's shoes, in light of clearly established law prohibiting segregation in public school, could have believed her actions were constitutional.

Having considered the testimony and evidence, the court concludes that Principal Parker acted in an objectively unreasonable fashion under clearly established law prohibiting segregation in public education. In other words, the court concludes that no reasonable school administrator in Principal Parker's shoes could have believed her actions met constitutional muster. With regard to non-LEP Latino students, the trial testimony and evidence, including Plaintiffs' Exhibit 117 prepared by Principal Parker and Plaintiffs' Exhibit 277 prepared by Dr. Evans, show non-LEP Latino students were assigned in grossly disproportionate numbers to the ESL-designated classes **without regard to their language abilities**, whereas their similarly situated non-LEP Anglo classmates were assigned to the general education classes. The evidence also shows African-

American students with the same language learning needs as Anglos were assigned to ESL classes, while their Anglo peers were assigned to General Education classes. Otherwise stated, the evidence demonstrates that, as to those Latino and African-American students with identical language learning needs as Anglo students (that is, they were all non-LEP), Principal Parker assigned them in a grossly disproportionate manner to ESL-designated classes, while their Anglo peers were assigned, with few exceptions, to "General Education" classes, also known as "neighborhood classes," which were predominantly Anglo. The statistics contained in Plaintiffs' Exhibits 117 and 277, showing the disproportionate assignment of non-LEP minorities to ESL classrooms and the assignment of Anglos to General Education classrooms, on their own, would have put a reasonable school administrator on notice that action needed to be taken to correct the problem.  Moreover, no reasonable school administrator in this day and age would set up a school where the races were racially segregated in different hallways, so that entire hallways in the school were racially identifiable.   Finally, the extreme lengths to which Principal Parker went to maintain the segregation, and her subsequent efforts to cover it up, evidence the objective unreasonableness of her conduct.  Examples include Principal Parker overriding Ms. Binfield's proposed Sixth Grade roster for the 2005-2006 academic year, in which the Anglo students were to be assigned equally among the Sixth Grade classes, and mandating instead that all the Anglo children were to be together in 6C-Gen.  To make matters worse, Principal Parker then tried to convince the court that she did not override Ms. Binfield's roster in the face of compelling evidence to the contrary.  Further, Principal Parker's failure to act in the face of Assistant Principal McElroy's exhortations to end mixed-age classes and eliminate segregation also reflects on the objective unreasonableness of her conduct.  Principal Parker's other post-litigation conduct, such as shuffling the students prior to Ms.

Guzman's visit to make the classrooms appear less segregated, also supports the court's conclusion that Principal Parker acted in an objectively unreasonable fashion contrary to clearly established law prohibiting segregation of minorities in public education.

Finally, the court heard from three teachers with a wealth of experience and from Assistant Principal McElroy, all of whom testified that they could think of no sound pedagogical reason for Principal Parker assigning non-LEP Latinos to ESL-designated classes, but assigning Anglo students to General Education classes, as there was no difference in their language learning needs.   Based on their collective testimony, and their years of experience as educators, the court concludes that a reasonable school administrator, absent a sound pedagogical basis, would not assign students to classes in such a way as to result in the ethnic composition of classrooms exhibited at Preston Hollow.

For the reasons herein stated, the court determines that Principal Parker knowingly violated the Fourteenth Amendment and the rights of Does #1 and #3.  Accordingly, she is not entitled to the defense of qualified immunity.

### D.     Title VI of the Civil Rights Act of 1964

Plaintiffs contend that Defendants violated Title VI of the Civil Rights Act of 1964, 78 Stat. 252, as amended, 42 U.S.C. § 2000d *et seq*.  Title VI provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI.  Section 602 of Title VI authorizes federal agencies to effectuate the provisions in § 601 by enacting regulations.  Pursuant to that authority, the Department of Justice promulgated regulations forbidding funding recipients from adopting policies that had "the effect of subjecting individuals to discrimination

because of their race, color, or national origin." 28 CFR § 42.104(b)(2) (1999).  In *Alexander v. Sandoval*, 532 U.S. 275, 280, 293 (2001), the Supreme Court held that private parties may not invoke Title VI regulations to obtain redress (whether injunctive or compensatory) for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination.  Thus, a plaintiff seeking relief for violations of Title VI must show intentional discrimination.  *Id.* at 293.

A plaintiff must be an intended beneficiary of, an applicant for, or a participant in a federally funded program in order to have standing to bring a claim under Title VI.  *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996) (citations omitted).  To state a claim for damages under Title VI, a plaintiff must allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance.  *Id.*  In this case, the parties have stipulated that DISD in an entity receiving federal financial assistance to maintain and operate educational programs for its schools.  *See* Joint Pretrial Order ¶ 8.  Defendants agree that a parent may bring a Title VI action on behalf of her children who are intended beneficiaries of a federally-funded public school program.  *See* Defendants' Proposed Conclusion of Law ¶ 427.

Numerous district courts have held that "the proper defendant in a Title VI case is an entity rather than an individual[.]" *Jackson*, 951 F. Supp. at 1298; *accord Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 95 F.Supp.2d 723, 741-42 (N.D. Ohio 2000); *Schuler v. Board of Educ.,* 2000 WL 134346, at *10 (E.D.N.Y. 2000); *Farmer v. Ramsay,* 41 F.Supp.2d 587, 592 (D. Md.1999); *Lyons v. City of Philadelphia,* 1998 WL 767451, at *3 (E.D.Pa. 1998); *Torrespico v. Columbia Coll.*, 1998 WL 703450, at *16 (N.D.Ill.1998); *A.D.E. Food Servs. Corp. v. City of Philadelphia*, 1996 WL 590906 at 4 (E.D.Pa. 1996); *Wright v. Butts,* 953 F.Supp. 1343, 1350 (M.D.Ala. 1996); *Clemes v.*

*Del Norte County Unified School District,* 1994 WL 317546, at *4-5 (N.D.Cal. 1994); *Bustos v. Illinois Inst. of Cosmetology, Inc.,* 1994 WL 710830, at *2 (N.D.Ill. 1994); *Robinson v. English Dept. of Univ. of Pennsylvania*, 1988 WL 120738, at *6 (E.D.Pa. 1988).  Plaintiffs have pointed the court to no cases, and the court has found none on its own, holding that an individual may be sued under Title VI.  Accordingly, based on the above-cited law, the court concludes that Defendant Principal Parker, sued in her individual capacity, is not a proper defendant under Title VI.

Further, the court has found no case law addressing whether, under Title VI, Teresa Parker or Superintendent Hinojosa are proper defendants as sued in their respective official capacities. Even assuming a principal or superintendent sued in his or her official capacity were a proper Title VI defendant, an official capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985).  Because Plaintiffs' suit is also against the entity, namely, DISD, any claims against Principal Parker and Superintendent Hinojosa, in their official capacities, are redundant.

Finally, the Board of Trustees is not a proper defendant under Title VI, as it is not an entity receiving federal financial assistance to maintain and operate any programs or activities.  In short, the only proper Title VI defendant in this case is DISD.

In the Fifth Circuit, "[t]o receive compensatory damages, a Title VI plaintiff must prove discriminatory intent."  *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir. 1996), *cert. denied*, 520 U.S. 1265 (1997) (citation omitted).[47]  Liability will not be imputed to the school district "absent direct involvement by the school district[.]" *Id.* at 400.  Plaintiffs at trial failed to adduce any

---

[47]In light of *Alexander v. Sandoval*, 532 U.S. 275, 280, 293 (2001), where the Court did not differentiate between injunctive relief and money damages when ruling that a showing of discriminatory intent was necessary, this court has no reason to believe that the Fifth Circuit would analyze a claim for injunctive relief under Title VI differently than a claim for compensatory relief.

evidence showing that DISD had any involvement, let alone direct involvement, in the manner in which students were assigned to classrooms at Preston Hollow.  Therefore, the question of intent or deliberate indifference by DISD under Title VI is really moot, as the proof fails before that question is reached.[48]

### E.        Monetary Damages

Damage awards in actions brought under section 1983 should "provide fair compensation for injuries caused by the deprivation of rights."  *Carey v. Piphus*, 435 U.S. 247, 258 (1978).  Compensatory damages pursuant to section 1983 are governed by common law tort principles.  *See Sockwell v. Phelps*, 20 F.3d 187, 192 (5th Cir. 1994).  Damages for emotional harm, however, are recoverable "only when a sufficient causal connection exists between the alleged injury" and "only when claimants submit proof of actual injury."  *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938 (5th Cir. 1996), *cert. denied*, 519 U.S. 1091 (1977).  In *Patterson*, The Fifth Circuit explained:

> [i]n order to establish tangible loss, we recognize that *Carey v. Piphus* requires a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award.  Hurt feelings, anger and frustration are a part of life.  Unless the cause of action manifests some specific discernible injury to the claimant's emotional state, we cannot say that the specificity requirement of *Carey* has been satisfied.

*Id.* at 940; *see also Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir. 1998), *cert. denied*, 525 U.S. 1105 (1999) ("Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a constitutional violation occurred supports an award of compensatory damages.");

---

[48]The court need not reach the issue of whether Superintendent Hinojosa's knowledge of Plaintiffs' allegations may be imputed to the school board under Title VI, as the court has already concluded that his actions did not rise to the level of deliberate indifference.  Any discussion of this issue, therefore, would be fruitless.

*Ryland v. Shapiro*, 708 F.2d 967, 976 (5th Cir. 1983) ("Mere proof of the violation of a right will not support an award of compensatory damages.").

In this case, Plaintiffs failed to prove a specific and discernible injury to the emotional state of Does #1, #2 and #3.  Plaintiffs offer no evidence that corroborates or quantifies the extent of any injuries.  Instead, Plaintiffs support their claims for mental damages with Ms. Santamaria's testimony regarding the harm her children suffered, and with Assistant Principal McElroy's testimony regarding harm to minority students caused by Principal Parker's classroom assignments. Ms. Santamaria testified that her children "feel separated from the other children, Anglos."  Tr. Vol. VI-A, at 115.  She further testified that her children told her "that the general [education] classes are the ones that are more advanced [than] where they are [. . .] [and] have commented that they don't feel intelligent like they are."  *Id.*  Her daughter told her she has no Anglo friends and that she feels "bad" compared to the Anglo children.  *Id.* at 116.[49]  Assistant Principal McElroy testified that the school counselor met with minority students on a regular basis.  He testified the minority students felt stigmatized because of the class assignments, and the counselor was "trying to affirm for them that, well, you're not any less smart because of the color of your skin."  Tr. Vol. III-A, at 56.  He testified that minority students raised concerns that "they felt like the white students were smarter. They tended to be in more advanced classes, that sort of thing."  *Id.*  He further testified that the segregated classrooms led to alienation among the ethnic groups and the students referred to one another as "The Mexicans, the Whites, and the Neighborhood Kids" and had sports competitions using these titles.  *Id.* at 48-49.  He stated that he, the counselor, the parents and several teachers

---

[49]Ms. Gonzalez's testimony regarding her child's harm due to segregated classrooms is not part of the court's damages analysis, as the court has previously determined that OFE only has associational standing to bring a claim for injunctive relief, and not monetary damages.

**Memorandum Opinion and Order - Page 98**

believed the students used these classifications "as a result of the way the classes were set up." *Id.* at 48.   Although the court recognizes the intentional violation of Doe #1's and Doe #3's constitutional rights, and is mindful of their understandably strong feelings, this testimony alone simply does not "speak to the nature, extent, and duration" of the harm "in a manner that portrays a specific and discernable injury." *Brady*, 145 F.3d at 720.   Although the result may seem harsh, Supreme Court and Fifth Circuit case law does not allow an award of compensatory damages based on these facts.

In the Fifth Circuit, a section 1983 plaintiff who proves a constitutional violation is nonetheless entitled to nominal damages in the absence of actual injury.  *See Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 302 (5th Cir. 2000), *cert. denied*, 532 U.S. 904 (2001); *see also Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986) ("[N]ominal damages . . . are the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury").  "By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." *Carey*, 435 U.S. at 266.   The court thus awards nominal damages in the amount of $100 to each of the Doe children, Doe #1, Doe #2 and Doe #3.  *See generally Williams v. Kaufman County*, 352 F.3d 994,   1014-15 (5th Cir. 2003) (district court's award of $100 in nominal damages in section 1983 case not clearly erroneous or abuse of discretion).[50]

Plaintiffs also seek punitive damages.  Plaintiffs cannot recover punitive damages against Principal Parker in her official capacity as a matter of law.  *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (punitive damages not recoverable against municipalities [and

---

[50]Under the circumstances of this case, the court determines that Doe #2 is not entitled to any damages, since he was properly classified as LEP and assigned to an ESL class.

**Memorandum Opinion and Order - Page 99**

persons acting in official capacity]).  The court, however, may award punitive damages against Principal Parker in her individual capacity for her "reckless and callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  "Reckless or callous indifference" requires "recklessness in its subjective form, [that is], a subjective consciousness of a risk of injury or illegality and a criminal indifference to civil obligations." *Williams*, 352 F.3d at 1015 (internal punctuation and citation omitted).  Moreover, "a punitive damage award may stand in the absence of actual damages where there has been a constitutional violation."  *Id.* (citation omitted); *Ryland*, 708 F.2d at 976 (citations omitted) (same).   The purpose of punitive damages under section 1983 is to punish as well as to deter future egregious conduct in violation of constitutional rights.  *See Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir. 1985).  The trier of fact may award punitive damages in its discretion when it deems it necessary to punish and deter the defendant.  *See Sockwell*, 20 F.3d at 192.

The court believes punitive damages are appropriate in this case.  Principal Parker's conduct reflects a reckless indifference to the constitutional rights of others.  The evidence adduced at trial demonstrates that Principal Parker had the final word in student classroom assignments and, for no sound pedagogical reason, deliberately assigned non-LEP Latino students into ESL-designated classes instead of General Education classes in order that Anglo students could be kept together in the same class.  The evidence further shows that a reason Principal Parker segregated the Anglo children into "neighborhood classes" was that the  Anglo parents in the neighborhood wanted their Anglo children together.  In addition to a classroom assignment plan with no sound pedagogical basis, the evidence also shows that in the main building, Principal Parker set up the actual classrooms in racially segregated hallways.  Further, Principal Parker subscribed to a schedule

whereby classes containing predominantly minority ESL and Bilingual children did not integrate with classes containing predominantly Anglo children throughout the school day for core curriculum, and with few exceptions, for non-core curriculum.  The court concludes that Principal Parker's disregard of Plaintiffs' Fourteenth Amendment rights, long-established by the Supreme Court, constitutes reckless indifference to such rights.  In addition, Principal Parker's post-litigation conduct and testimony reveal that she was not acting in good faith.  Her post-litigation conduct and testimony from the teachers and Assistant Principal reveal a calculating school administrator seeking to deceive visitors regarding student classrooms assignments at Preston Hollow.  For example, Principal Parker sought to cover up the segregation when Ms. Guzman, after receiving a court order allowing her to visit the school, went to Preston Hollow.  The unrebutted evidence shows that Principal Parker redistributed the students' classroom assignments in such a way as to make them appear more integrated.  She took the extreme measure of sending KC-Gen. teacher Ms. Prudhomme away from the school at that time so that she could shuffle the Kindergarten classes.  Principal Parker was also responsible for allowing the shuffling of Fifth Grade classroom assignments to coincide with Ms. Guzman's visit.  Other acts to mask the segregation included Principal Parker altering the graduation ceremony at the end of the 2005-2006 academic year from the way it was conducted in prior years.  Instead of having the students come to the stage by class, the children came to the stage by grade in alphabetical order.

Finally, Principal Parker's segregation of Latinos from Anglos at Preston Hollow is not an isolated incident.  The evidence shows that her methods of student classroom assignments have been going on for several years.  In short, the evidence shows the nature and extent to which Principal Parker disregarded the right to equal protection of the laws guaranteed by the Fourteenth

Amendment. Principal Parker's behavior over the years demonstrated a total lack of concern for the constitutional rights of Latino school children to learn in integrated classrooms. When public officials break the law, they must be held accountable. Our Constitution requires nothing less. Punitive damages should be assessed against Principal Parker to punish her for her conspicuous violation of Doe #1's and Doe #3's constitutional rights, and to serve as a deterrent to any other school administrator who might be inclined to engage in conduct similar to that of Principal Parker. The court thus exercises its discretionary authority and finds the goals of both punishment and deterrence are served by an award of punitive damages in this case. The court concludes that an award of punitive damages in the amount of $10,000 to Doe #1 and $10,000 to Doe #3 is necessary to accomplish these goals.[51] Accordingly, the court assesses punitive damages against Principal Parker in the amount of $20,000 to be paid to Does #1 and #3 in the manner and amounts set forth directly above.[52]

---

[51]As Doe #2 was not awarded any damages, he is not entitled to punitive damages.

[52]The issue of punitive damages was not adequately briefed by the parties. Plaintiffs included one sentence in their Proposed Findings of Fact and Conclusion of Law. *See* Proposed Conclusion of Law ¶ 200 ("Punitive damages can be assessed here because there is evidence that Defendant Parker's conduct involved reckless and callous indifference to the federally protected rights of others.") (citations omitted). Defendants did not address punitive damages at all. Plaintiffs failed to incorporate into the record any suggestion of what an appropriate punitive damage award would be in this case, and the court has no evidence regarding Principal Parker's net worth. The court therefore uses its discretion to set what it believes is the appropriate amount of punitive damages, considering the egregious nature of Principal Parker's conduct in this case. In determining the amount of punitive damages, the court used the same approach that it used in a recent case which was approved by the Fifth Circuit. *See Williams v. Kaufman County*, 86 F.Supp.2d 586 (N.D. Tex. 2000), *aff'd*, 352 F.3d 994, 1014-15 (5th Cir. 2003).

The court believes the amount of punitive damages awarded in this case falls well within the constitutional limits on such damages as established by the Supreme Court in *BMW of N. Am. Inc. v. Gore*, 517 U.S. 559 (1996), and by the Fifth Circuit in *Rubinstein v. Adms' of Tulane Educ. Fund*, 218 F.3d 392 (5th Cir. 2000); *Deffenbaugh-Williams v. Wal-Mart*, 156 F.3d 581 (5th Cir. 1998), *reh'g en banc granted*, 169 F.3d 215 (5th Cir. 1999) panel opin. reinstated in relevant part, 182 F.3d 333 (5th Cir. 1999); and *Patterson*, 90 F.3d at 927. In assessing the amount of punitive damages, the court considered "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm suffered and the damage award; and (3) the difference between the damages awarded in this case and comparable cases." *BMW*, 517 U.S. at 575. In *Deffenbaugh-Williams*, the Fifth Circuit explained "perhaps the most important indicium of the reasonableness of a punitive damages award is the *degree of reprehensibility* of the defendant's conduct." 156 F.3d at 597 (*quoting BMW*, 517 U.S. at 575) (emphasis by Fifth Circuit). As explained above, the court finds a high degree of reprehensibility in this case, and thus gives greater weight to this factor over the others.

With respect to the second *BMW* factor, the Fifth Circuit has held that "any punitive damages-to-*compensatory*

### F.        Injunctive Relief

Plaintiffs seek injunctive relief.[53]  The elements for a permanent injunction are essentially the same as those for a preliminary injunction "with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).  The elements for granting a preliminary injunction are: (1) a substantial likelihood that plaintiff will prevail on the merits; (2) a substantial threat that irreparable injury will result if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm to defendant; and (4) that granting the preliminary injunction will not disserve the public interest.  *Canal Auth. of the State of Florida  v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (*en banc*).  The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a preliminary injunction can be granted.  *Mississippi Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985).  Otherwise stated, if a party fails to meet *any* of the four requirements, the court cannot grant the preliminary injunction.  As Plaintiffs have succeeded on the merits of this action with regard to their section 1983 claim against Principal Parker in her individual capacity(*see supra*), they have satisfied the first prerequisite for injunctive relief.

---

damages 'ratio analysis' cannot be applied effectively in cases where only *nominal* damages have been awarded[.]"  *Williams*, 352 F.3d at 1016. (Emphasis in original).

Finally, the court notes, with respect to the third *BMW* factor, that it is unable to determine whether the punitive damages award in this case is within the range of punitive damages imposed in comparable cases.  In this day and age, a case of obvious segregation based on race or national origin is relatively unique.  The court has found no similar cases awarding punitive damages with which to compare its award in this case, but instead has used its measured discretion in determining the appropriate amount of punitive damages in this case.

[53]In their Proposed Findings of Fact and Conclusions of Law, Plaintiffs contend that they are entitled to a "preliminary injunction."  At this stage of the case, of course, the proper terminology for what Plaintiffs seek is a "permanent injunction."

Plaintiffs have also submitted evidence from which the court concludes that there is substantial threat that irreparable injury will result if the injunction is not granted.  It does not require a mathematician or educational psychologist to conclude that being segregated and placed in ESL classrooms in different hallways from one's Anglo counterparts would adversely affect a minority student's self esteem, leading to feelings of being stigmatized based on race and national origin, as well as adversely affect a minority student's ability to obtain the same benefit from schooling as his or her Anglo counterpart.  Moreover, at trial, Principal Parker provided the court with no assurances that, other than doing away with the mixed-age classes, the above-described manner of student classroom assignments would be any different in the 2006-2007 academic year.  Doing away with mixed-age classes does not change the fact that non-LEP Latino and African-American students are being assigned to ESL classes, while similarly situated Anglo non-LEP students are not.  Further, Principal Parker provided no indication that the classroom rotation schedule would be altered in such a way as to provide LEP students of whatever ethnicity a meaningful opportunity to interact with English-speaking students during the school day.  She also failed to provide any assurance that hallways would no longer be racially identifiable.

The court also determines that the threatened injury outweighs any conceivable threatened harm to Defendants.  In Defendants' Proposed Findings of Fact and Conclusions of Law, Defendants provide the court with no argument regarding Plaintiffs' request for injunctive relief.  Given the testimony of Ms. Santamaria and Ms. Gonzalez regarding their children's feelings of inferiority to the Anglo students in the general education classes, and Assistant Principal McElroy's testimony regarding minority students' need for counseling because of the segregation at Preston Hollow, the

court concludes that the need to remedy the unlawful segregation and vindicate the constitutional rights of schoolchildren far exceeds any possible harm to Defendants.

Finally, granting an injunction will not disserve the public interest.  A school where segregation occurs is completely failing in its mandate to provide a nondiscriminatory educational environment.  The public has a strong interest in knowing that public resources are not used to promote illegal segregation, and an injunction will help accomplish this objective.

Further, the court finds injunctive relief necessary because Principal Parker has, in the face of more than fifty (50) years of case law forbidding segregation in public schools, insisted that she has not violated the Fourteenth Amendment to the United States Constitution.  Absent injunctive relief, the court has no guarantee that she will not continue violating the United States Constitution by maintaining classes segregated by race and national origin at Preston Hollow.  Absent injunctive relief, the court likewise has no guarantee that she will not continue to maintain a class rotation schedule that deprives LEP students of meaningful interaction with English-speakers during the school day.  The court also notes that Teresa Parker is still Principal at Preston Hollow and Ms. Bittner is still the President of the Preston Hollow PTA.  The court has been given no reason to believe that under these circumstances the unlawful segregation will cease absent court intervention.  Accordingly, Plaintiffs are entitled to permanent injunctive relief.

### G.      Attorney's Fees

Under § 1988, the court "may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.  The court determines that Plaintiffs are the prevailing parties because they have obtained an enforceable judgment against Defendant Principal Parker which materially alters the legal relationship between them.  *See Farrar v. Hobby*, 506 U.S. 103, 111 (1992).   A prevailing party may recover only those fees that are reasonably expended on the litigation.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983); *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993).  A party is not entitled to attorney's fees for the prosecution of an unsuccessful claim unless it involves common facts or derives from related legal theories of another claim that is successfully prosecuted.  *See Hensley*, 461 U.S. at 434.

In light of the finality of this matter regarding the merits, the court recognizes the possibility of resolution of the attorney's fee issue without court intervention.  The Supreme Court has admonished that "[a] request for attorney's fees should not result in a second major litigation."  *Id.* at 437.  Ideally, the attorney's fee issue should be resolved by the parties.  The court recognizes that this will not always be the case, but the parties shall exhaust all reasonable efforts to resolve the attorney's fee issue.  Any request for attorney's fees shall be filed in accordance with Fed. R. Civ. P. 54(d)(2).

## IV.      Conclusion

### A.      Liability

For the reasons stated herein, the court concludes that Plaintiffs established a violation of the Fourteenth Amendment by Defendant Teresa Parker acting in her individual capacity.  The court is convinced that several of the area superintendents knew, or should have known, about the illegal

segregation at Preston Hollow; however, the applicable law prevents the court from imposing liability on such individuals.  Although the legal liability in this case falls on Principal Parker, as a practical matter she did not operate in a vacuum.  It appears that some of her supervisors either were asleep at the wheel with respect to their oversight responsibilities, or did not appreciate the gravity of the matter.  In light of the court's findings and conclusions herein, it will render judgment against Defendant Teresa Parker, Principal of Preston Hollow Elementary School, acting in her individual capacity, by separate document as required by Fed. R. Civ. P. 58.  The court, for reasons previously expressed, concludes that Defendants DISD, the Board of Trustees, Superintendent Hinojosa in his official capacity and Principal Parker, in her official capacity as Principal of Preston Hollow, did not violate the Fourteenth Amendment to the United States Constitution or Title VI of the Civil Rights Act of 1964.  Further, for reasons previously set forth, the court concludes that Principal Parker in her individual capacity did not violate Title VI of the Civil Rights Act of 1964.

### B.      Monetary Relief

The court awards nominal damages in the amount of $100 to Doe #1 and $100 to Doe #3.  The court awards punitive damages in the amount of $10,000 to Doe #1 and $10,000 to Doe #3.  All damages are assessed against Principal Parker in her individual capacity.

### C.      Injunctive Relief

The court has concluded that injunctive relief is necessary to enjoin Defendant Parker's violations of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  Accordingly, Defendant Parker is hereby **permanently enjoined** and **prohibited** from violating the rights of Plaintiffs to equal educational opportunities as guaranteed by the Fourteenth Amendment to the United States Constitution.

The court **orders and directs** Defendant Parker to evaluate the educational opportunities afforded to non-LEP students in ESL and General Education classes at Preston Hollow Elementary School and to take specific steps to correct and remedy all practices, conduct or actions taken, or allowed to be taken, by her that caused the illegal segregation of students as set forth by the court in Section III(B), Conclusions of Law, pp. 65-79, of this opinion and order.

Further, the court hereby **orders** and **directs** Defendant Parker to integrate non-core curriculum instruction. The court also **orders** and **directs** Defendant Parker to eliminate the racially identifiable hallways that exist at Preston Hollow Elementary School and identified by the court in this order and opinion.

Finally, the court **enjoins** and **prohibits** Defendant Parker from assigning any student to a class, or placing any student in a program, on account of that student's race or national origin. Likewise, Defendant Parker is **enjoined** and **prohibited** from reserving a class assignment or program for a student because of such student's race or national origin.

The court hereby allows a reasonable time for compliance with this injunction; however, all compliance must be accomplished by **January 17, 2007**.

**It is so ordered** this 16th day of November, 2006.


Sam A. Lindsay
United States District Judge